648

No. 28,259.

The City of Wichita, *Appellant*, v. John Ferriter, *Appellee*.

(270 Pac. 592.)

Opinion filed October 6, 1928.

*A. V. Roberts, Vincent F. Hiebsch* and *Roger P. Almond,* all of Wichita, for the appellant.

*Arnold C. Todd* and *Hal M. Black,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Burch, J.: In execution of a flood-prevention project, the city of Wichita condemned land belonging to John Ferriter. He appealed from the award of compensation. At the trial on appeal, the jury returned a general verdict and special findings of fact. The court set aside one of the findings on the ground it was not sustained by any evidence, and granted a new trial. The city appeals.

The condemned tract contained 5.98 acres. All of the tract, except 1.5 acres, lay in the channel of the Little Arkansas river below high-water mark. The value to the landowner of that portion of the tract consisted in a deposit of commercial sand and gravel. After condemnation, the landowner removed 16,820 cubic yards of the deposit. The city counterclaimed for the value of the sand and gravel removed.

The jury returned the following special findings:

"No. 1: What amount do you allow the appellant, John Ferriter, for the value of the sand in the land condemned and taken by the city? A. $12,500.

"No. 2: What was the most advantageous use for which the 5.63 acres was adapted in June, 1925? A. Production sand and gravel.

"No. 3: How much commercial sand and gravel was contained in the 5.63 acres in June, 1925? A. 50,000 cubic yards.

"No. 4: What was the value of such sand and gravel in place per cubic yard in Wichita, in June, 1925? A. 25 cents.

"No. 5: How much do you allow the city for the 16,820 cubic yards of sand taken by Mr. Ferriter subsequent to June 22, 1925? A. $4,205."

The court set aside the third finding.

The condemnation occurred in June, 1925. In February, 1926, the county surveyor surveyed the tract and, with the assistance of the county engineer, investigated the quantity of sand and gravel. They bored test holes, found the depth of the deposit to be twenty-nine feet, and by mathematical calculation determined the tract then embraced 340,000 cubic yards of sand and gravel. The method adopted was the only scientific method of determining the fact, and that the method was employed with the result stated was not questioned. There was no dispute that the sand and gravel were of commercial quality.

When the land was appraised, F. W. Washburn was pumping sand from the tract, under an arrangement with the owner. The appraisers asked Washburn how much sand there was. Washburn said he could pump it all out in sixty days, pumping three hundred cubic yards per day. The appraisers were witnesses for the city and gave their opinions respecting the value of the land. They testified that in arriving at their estimates of value they took into consideration the quantity of sand, based on the information supplied by Washburn. What Washburn said to the appraisers was not evidence of quantity of sand. It was merely a prop on which witnesses called to testify to value of land rested their opinions.

At the trial Washburn testified he had been pumping sand from the tract for more than three years, and the depth of the sand was uncertain. He had pumped at one place to a depth of thirty-five feet, and at another place to a depth of twenty-five feet, but had never reached the hardpan below. He had pumped at but few places, and there were plenty of other places to be pumped. By reason of the peculiar location of the deposit in the stream, high water constantly refilled the pit, and this made the supply of sand almost inexhaustible. There was other testimony that every little freshet filled the pit from which Washburn pumped.

A witness for the city testified most of the condemned tract formed the bed of the river and the first overflow bank. Another witness for the city testified the available sand was the channel

where they had water and to make the remainder available it would be necessary to remove some trees and roots. He hazarded no guess as to quantity of sand. Another witness for the city, who owned a sand and gravel pit on a fourteen-acre tract on the same river, said the deposit on his tract was about seventeen feet thick. It was agreed that between the time the tract was condemned and the time the surveyor and the engineer found there were still 340,000 cubic yards of sand in place, the 16,820 cubic yards for which the jury allowed the city $4,205 had been removed.

The jury disregarded what Washburn said to the appraisers and found there were 50,000 cubic yards of sand and gravel on the tract when it was condemned. Clearly there was no evidence to support the finding. In a proper case, a jury may reconcile conflicting testimony and arrive at a result which does not have the specific statement of any witness to support it. This is especially true in dealing with intangibles such as value. A conclusion that the true value is something more than the lowest estimate and something less than the highest may well be justified. The conclusion, however, must be sustained by evidence. Thus, in the case of *Smith v. Tri-County Light & Power Co.*, 120 Kan. 123, 241 Pac. 1090, the jury allowed damages in the sum of $900 for negligent destruction of a barn by fire. In the opinion, the court said:

"It is true that each witness who placed a value upon the barn in his testimony, placed such value at $2,000, but that is not all of the evidence before the jury as to the value of the barn. Its description was given in detail. Its size, the material of which it was built, the fact that it had been built seventeen years, all furnished ground upon which the jury could base a judgment as to its value, even though no witness had stated a specific sum as to the value. While the jury might have found a different value on the barn, they had evidence to sustain the finding which was made." (p. 128.)

In this instance, the jury had no background of general or common knowledge respecting about how much sand there might be in a bend of a river. The only information on the subject afforded by the evidence has been recited, and the quantity stated in finding No. 3 was arbitrarily determined without evidence.

The city contends the evidence relating to quantity of sand was improperly received; the finding should have been ignored; and, conceding the finding was inaccurate, a new trial should not have been granted. There were two answers to the contention: first, the general verdict was based on the erroneous finding; second, quantity of sand was a material factor in determining compensation.

The question was, of course, what was the value of the land for its most beneficial use. Testimony on behalf of the city was that the land was worth practically nothing except for the sand which could be taken from it. If the quantity were only one or two thousand cubic yards, the land was not worth much; if the quantity were very much greater, the land was worth considerably more. The law requires that the landowner be compensated. Rules for the ascertainment of damages must be adapted to fulfillment of the purpose of the law. In computing the compensation, other factors were to be considered besides number of cubic yards and selling price per cubic yard; but no fair computation of compensation for the taking could be made until it was known just what had been condemned.

The judgment of the district court is affirmed.