No. 41,104

VICTOR B. EISENRING, *Appellee,* v. KANSAS TURNPIKE AUTHORITY, *Appellant.*

(332 P. 2d 539)

Opinion filed December 6, 1958.

*Thomas W. Cunningham,* of Wichita, argued the cause, and *Robert S. Lomax* and *Fred J. Gasser,* both of Wichita, and *Robert M. Cowger* and *Bruce Works,* both of Topeka, were with him on the brief for appellant.

*Lyndon Gamelson,* of Wichita, argued the cause, and *Milton Zacharias, Kenneth H. Hiebsch, Richard A. Render, Albert L. Kamas, Donald E. Lambdin* and *David G. Arst,* all of Wichita, were with him on the brief for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a condemnation action arising from the separate appeal of a lessee when the Kansas Turnpike Authority condemned part of the land upon which the lessee had a sand lease.

From a verdict and judgment in favor of the lessee the Kansas Turnpike Authority duly perfected an appeal presenting the questions hereafter discussed.

Damages to the landowner by reason of the condemnation of this particular tract of land were disposed of by settlement in another case, after the original opinion of this court was announced in *Moore v. Kansas Turnpike Authority*, 181 Kan. 51, 310 P. 2d 199, and *prior* to its reversal on rehearing in 181 Kan. 840, 317 P. 2d 384, on October 25, 1957, and are, therefore, not an issue in this case. At that time the rights of the lessee were preserved by stipulation of counsel and the severance of the two claims is not an issue in this appeal.

The appellant presents two questions in its brief:

1. Did the trial court err in allowing the expert witnesses produced by the lessee, appellee herein, to testify over appellant's objection as to the fair and reasonable market value of a sand lease when it was admitted by these experts that they had no knowledge of a sand lease ever having been sold?

2. Did the trial court err in refusing to allow appellant the opportunity to fully cross examine the appellee's expert witnesses as to the method used in computing their opinions of the market value?

In the instant case, the appellee, Victor B. Eisenring, was lessee of a 26.36-acre sand and gravel lease near the plant of the Boeing Airplane Company and the McConnell Air Base in Wichita. Insofar as material to this appeal, the term of the lease was from September 4, 1954, until September 4, 1956. At the time of the taking by the turnpike on June 23, 1955, a little over 14 months remained prior to the expiration of the lease. Mr. Eisenring was operating the lease by a "pumping" type operation with a lake, barge and sand pump.

The Kansas Turnpike Authority condemned its right of way and installed the turnpike highway through the approximate middle of the lease, leaving approximately 10 acres on the south accessible from McArthur Road, which is a street in Wichita. The remaining portion of the lease is covered by the turnpike highway and that portion to the north which is not occupied by the turnpike was made inaccessible. The turnpike appraisers apparently disregarded the lease of Victor B. Eisenring, as no appraisal or award was shown. Mr. Eisenring proceeded to obtain a jury determination of his damages, and the jury found that the fair market value of the Eisenring lease before the taking by the Kansas Turnpike Authority was $32,000, and immediately after the taking was $16,000. It therefore assessed the amount of damages at $16,000. The turnpike appealed from this verdict, and the judgment entered thereon.

Directing our attention now to the first question above stated, the turnpike contends that, inasmuch as each of these expert witnesses testified that he had no knowledge of a sand lease ever having been sold in the area around Wichita, they were not qualified to testify.

The following expert witnesses were called to testify for the appellee. Mr. Don Moehring, a graduate and licensed engineer, had done consulting work as a civil engineer for many companies including producers and users of sand and other materials, was a design and construction engineer for the United States Army in World War I, and helped organize the State Highway Department of South Dakota. He testified that the value of the leasehold before the taking by the turnpike was $49,181.25 and the fair market value after the condemnation was $9,890.63, the difference being $39,290.62.

P. R. York, an independent sand producer for 21 years in Sedgwick County, testified that he generally leased the ground where he conducted his sand pumping operations, and had examined this particular lease on various occasions; that sites for sand operations in this area were very scarce; that the market value of the leasehold was $52,460 immediately prior to the condemnation, and that the market value of the lease immediately after the taking was $10,550, a difference of $41,910.

Mr. W. B. Tolbert was superintendent of the Superior Sand Company which produces fill sand, concrete sand, mason sand and road gravel for commercial sales, and supplies materials for ready-mix operations. The owners of the company carry on a paving business and asphalt business known as Richie Brothers Construction Company and Allen's Incorporated. He testified as to the characteristics of the lease and he had made tests of the sand in the particular area. In his opinion the market value of the leasehold interest was $50,230.45 before the taking, and the market value of the lease after the taking was $10,101.62, a difference of $40,128.83.

Mr. Robert R. Provence, who had been in the business of commercial sand production for 28 years, had hauled some of the material from Mr. Eisenring's operation until the turnpike went through the lease. He had done a lot of business in the southeast part of Wichita during 1954 and 1955 and testified as to the location feature of this particular lease and the hauling problem in connection with sand production. He had tried to find another sand location in that area without success. His opinion of the

fair market value before the taking was $47,214, and after the taking was $9,495, a difference of $37,719.

The witnesses for the appellee pointed out that there was sand under much of the City of Wichita close to the river, but no commercial sand available east of the point where the terrain comes up out of the river area. For example, there is no commercial sand east of the air base. The testimony developed that there had been a sand operation immediately across McArthur Road to the south of the Eisenring lease, which was already exploited. The other area in the immediate vicinity of the sand lease was either residential or industrial development and could not be obtained for sand operations.

An exhibit prepared by a licensed engineer was introduced into evidence to show the acreage in the Eisenring lease and the quantity of sand in the leasehold. It disclosed that 7.41 acres and 194,300 cubic yards were occupied by the turnpike right of way, and that 9.39 acres and 139,200 cubic yards were made inaccessible by the turnpike right of way.

Mr. Robert Bright, a graduate engineer and superintendent for Martin K. Eby Construction Company, testified as to the large scale construction projects going on during the 1954-1955 period, during the tenure of this lease, such as the Materials Building at Boeing Airplane Company which covered an area of 22 acres and required fill sand from 3 to 10 feet in depth over the entire area. A conservative estimate of the quantity of fill sand needed was between 150,000 to 175,000 tons. There was also a 5,600 car parking ramp for Boeing Aircraft requiring approximately 45,000 tons of fill sand. A new runway at McConnell Air Base approximately 300 feet wide and 2 miles long required a fill sand cushion underneath the slab and also fill sand in the sewage and drainage system.

The evidence disclosed the close proximity of the Eisenring sand operation to these projects and indicated the competitive advantage Mr. Eisenring had by reason of this location, since the hauling of sand figured as a principal item of expense. The cost of hauling sand was stated to be about five cents per ton mile.

Apparently it is the turnpike's theory of the case that since sand leases are not traded in commerce, there can be no damages. This is consistent with the testimony of the expert witnesses produced by the turnpike. It presented three real estate men who knew nothing about the sand business and nothing about the factual

features of the sand lease in question. They testified that the "piece of paper," the lease as an instrument, had no value.

On the point of law presently under discussion this court several years ago had the identical question before it in *Miles v. City of Wichita*, 175 Kan. 723, 267 P. 2d 943. That case involved a sand lease near Wichita where the same expert witnesses used in the instant case testified as experts. The objection there was that the expert witnesses were permitted to testify to a market value derived from factors which were improper for a jury to consider—that it was predicated upon speculative factors and had no probative value—and thus constituted no evidence of value at all. This objection was summarily dismissed by stating ". . . It was proper for the witnesses to consider in passing their opinion as to the market value of the lease matters, such as investment value of one of many criteria in reaching a conclusion. . . ." (p. 729.)

The absence of market value, in the sense that there is a lack of evidence of comparable sales, does not prevent recovery by the owner in the event of condemnation. It occasionally happens that a parcel of real estate or a leasehold interest taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, he would be unable to sell it at anything like its real value. Where the usual means of ascertaining market value are lacking, or other means must from necessity of the case be resorted to, it is proper to determine the market value by considering the intrinsic value of the property, and its value to the owners for their special purposes. The owner of the property taken is not required under such circumstances to make any pecuniary sacrifices. He is entitled to whatever the property is worth to him, or anyone else, for any purpose to which it is adapted. These special uses or purposes to which the property is adapted must be real—founded upon facts capable of proof—and not merely speculative or imaginary. If the owner has adopted a peculiar mode of using the land, by which he derives profit, and he is to be deprived of that use, justice requires that he be compensated for the loss to himself. It is the value which he has, and of which he is deprived, which must be made good by compensation. (4 Nichols on Eminent Domain [3rd Ed.], § 12.32, p. 133.)

In the absence of market value, because the special type of property is not commonly bought and sold, resort may be had to the testimony of more specialized experts. The value of property for a

special use to which it is adapted or put may be shown by persons familiar with such use, even though they are not familiar with land values generally. If a witness, by reason of his skill, learning or technical training, understands the adaptability of the lands in question for a particular purpose and the demand for land for such purpose, he may state the market value of the land. (See 5 Nichols on Eminent Domain [3rd Ed.], § 18.41 [3], p. 160; and authorities accumulated therein.)

Kansas cases in accord with the foregoing rules are *K. C. & S. W. Rld. Co. v. Ehret,* 41 Kan. 22, 20 Pac. 538; *K. C. & S. W. Rld. Co. v. Baird,* 41 Kan. 69, 21 Pac. 227; *Railway Co. v. Weidenmann,* 77 Kan. 300, 94 Pac. 146; *Burger v. City of Wichita,* 132 Kan. 105, 294 Pac. 670; and *Unruh v. Kansas Turnpike Authority,* 181 Kan. 521, 313 P. 2d 286. See, also, *Montana Railway Co. v. Warren,* 137 U. S. 348, 11 S. Ct. 96, 34 L. Ed 681; and *Phillips v. United States,* 243 F. 2d 1.

It is established in Kansas that a tenant under a lease is an "owner" of property within the meaning of that term as used in our condemnation statutes, and is entitled to compensation if his leasehold estate is damaged by the exercise of eminent domain. (*State Highway Commission v. Safeway Stores,* 170 Kan. 413, 226 P. 2d 850, set aside on rehearing for other reasons in 170 Kan. 545, 228 P. 2d 208. See also, *Bales v. Railroad Co.,* 92 Kan. 771, 141 Pac. 1009; and *Comm'rs of Smith Co. v. Labore,* 37 Kan. 480, 15 Pac. 577.)

In our opinion appellee's witnesses were eminently qualified as experts specialized by experience, education and technical training in the sand business. They were familiar with sand deposits and the use and demand of sand products in the Wichita area, including the adaptability of the sand and gravel deposits covered by the lease in question for their best and most advantageous use.

Counsel for the turnpike attempted in vain to show that appellee's expert witnesses were valuing the Eisenring sand lease solely on the basis of profits. They did this by taking some of the appellee's witnesses on *voir dire* examination. They also cross-examined the witnesses. Regarding appellant's efforts in this respect, complaint is first made of the testimony of Don Moehring on cross examination. Appellant, treating this under its first question heretofore stated, contends that it was extremely prejudiced by the method in which this witness arrived at the fair market value

of the lease. The following was a portion of Moehring's testimony on cross-examination:

"Q. What do you mean by fair market value?
"A. The return to the lessees from that land from its best use.
"Q. What kind of return, Sir?
"A. Monetary return; the value—the monetary value.
"Q. Over what period of time are you speaking?
"A. Over the tenure of the lease.
"Q. That is based on what he could expect to receive from the term that the lease had to extend, in the way of profit?
"A. That is correct."

Appellant relies on *Bales v. Railroad Co.*, supra, for the proposition that testimony based on anticipated profits should not be allowed. Neither the facts nor the opinion in the *Bales* case supports appellant on the facts presently before the court. It was said in the *Bales* case that ". . . Anticipated profits as an element of damages are only allowed where reasonably certain; when speculative, remote and contingent they are excluded. (*Railway Co. v. Thomas*, 70 Kan. 409, 78 Pac. 861.) While it may be that the profits of the business were susceptible of proof, the part of such profits attributable to the continuance of the lease seems to be a matter of conjecture." (p. 777.) See, also, *Glover v. State Highway Comm.*, 147 Kan. 279, 77 P. 2d 189.

On the facts presently before the court there is no question concerning the continuance of the lease until September 4, 1956. Under the terms of the lease Eisenring had a one-year lease with an option to extend the lease for an additional year on the condition that at the expiration of the first year his pump and sand equipment was left on the leased premises and the pit was to be operated. While this may have made it difficult to sell the lease, it nevertheless was of value to the lessee and binding as a lease upon the lessor.

Prior to the testimony elicited from Don Moehring on the cross-examination, as heretofore indicated, the witness testified that he made an examination of the Eisenring lease; that he made measurements on the ground and core tests; that he made analysis checked by laboratory in the City of Wichita; made direct comparisons as to the areas and quantities and determined the depths of material encountered and available on this site and, from the same, determined what in his opinion was the best and most advantageous use of the site. He made test holes and determined the types of materials shown on an exhibit which was introduced into evidence, and made an actual computation of the number of cubic yards of material that

were present. In arriving at his opinion as to value he testified that he considered, first, the location of the property; the location of the possible users of this type of material encountered in this site; determined the location with regard to the distance to available sites, and at that time, checked these with the distances of other pits that could supply a similar type of material from an available source of supply; that he considered the cost of the production of the materials, the equipment in place or available, the terms and conditions of the lease and any other features which might affect the profit.

The lease in question was a royalty lease calling for payment of a fixed sum (Fill dirt 10 cents per ton or 16 cents per yard, and concrete sand 16 cents per ton or 22 cents per yard) on all sand and gravel sold without any other consideration being paid for the lease.

The record discloses no evidence whatever that this witness or any other witness determined the market value by multiplying the number of cubic yards of sand and gravel by the selling price per cubic yard. The testimony of other witnesses clearly indicates they were not relying on any speculative or income formula. For example, Mr. Tolbert, an experienced sand operator, was asked by turnpike counsel:

"Q. What was the figure that you used then, Mr. Tolbert, to arrive at— what cubic yard number did you use in this computation? Did you use so much value per cubic yard after you got the length and width and the depth as you stated mathematically, how much per cubic yard did you use in figuring the material in place?

"A. I didn't figure it that way. You might total it that way, I suppose."

In this case we are concerned with a *sand lease valuable because of its sand yield.* Income to the lessee is of necessity a factor to be considered in determining value. In the *Bales* case anticipated profits were conceded to be a proper element of damages where reasonably certain. In making a determination of the market value of the furniture dealer's lease, it was proper to consider ". . . the nature and prosperity of the business carried on there if it affects the value of the lease . . ." (*Bales v. Railroad Co.,* 92 Kan. 771, 777, 141 Pac. 1009.) Here Eisenring's lease was in operation and the element of income was present at the time of the condemnation, not in the uncertain future.

It was said in *City of Wichita v. Ferriter,* 126 Kan. 648, 270 Pac. 592:

".  .  . Testimony on behalf of the city was that the land was worth practically nothing except for the sand which could be taken from it. If the quantity were only one or two thousand cubic yards, the land was not worth much; if the quantity were very much greater, the land was worth considerably more. *The law requires that the landowner be compensated. Rules for the ascertainment of damages must be adapted to fulfillment of the purpose of the law.* In computing the compensation, other factors were to be considered besides number of cubic yards and selling price per cubic yard; but no fair computation of compensation for the taking could be made until it was known just what had been condemned." (Emphasis added.) (p. 651.)

In 18 Am. Jur., Eminent Domain, § 345, p. 989, after repeating the general rule that *profits* derived from a business are too speculative to be considered, continues:

".  .  . But in determining the fair market value of the land, it is proper for the jury to consider whether the lands were adapted to the particular use to which they were devoted, and were profitable and valuable for that use, and for this purpose it is sometimes unobjectionable to admit evidence of the actual profits. Thus, evidence as to the amount of profits may be considered where it appears that the property condemned is of such a nature that the profits derived from its use are the entire or chief source of its value,  .  .  ."

In *State Roads Com. of Md. v. Novosel,* 203 Md. 619, 102 A. 2d 563, a strip of land was taken to widen a highway. The Maryland Supreme Court said that in determining the value of land consideration will be given to its productive capacity. The court states:

"As a practical matter, a prospective purchaser would hardly fail to consider whether or not the business conducted on the premises had proved profitable, for this would be a measure of the desirability of the location, if not to him then to other purchasers.  . The precise weight to be accorded to this factor is a matter of judgment on which experts may differ, and of this the jury is the final judge.  .  .  .

"With the increasing vogue of leases of business property reserving rentals computed on a percentage of the volume of business transacted by the tenant, it would be artificial and illusory to reject an expert opinion of rental value that takes into account the volume of business which experience has shown a particular piece of property is capable of producing; and, of course, the resulting profits may be, if anything, even more pertinent to the question of value. We find no basis for the objection either to the testimony of the expert, or to that of the owner who as such, irrespective of other qualifications, is permitted to give his estimate of the value of his holdings. *Bailey v. Ford,* 151 Md. 664; *Pennsylvania Threshermen & Farmers Mutual Casualty Ins. Co. v. Messenger,* 181 Md. 295, 302; *Jackson v. Linthicum,* 192 Md. 272, 276; 3 *Wigmore on Evidence* (3rd Ed.), Sec. 716." (pp. 624, 625.)

See, also, *Korf v. Fleming,* 239 Ia. 501, 32 N. W. 2d 85; *L. & N.*

*Turnpike Co. v. Creveling,* 159 Tenn. 147, 17 S. W. 2d 22; and *H. & H. Supply Co. v. United States,* 194 F. 2d 553.

Regarding the *valuation of land* with sand deposits this court said in *Reiter v. State Highway Commission,* 177 Kan. 683, 281 P. 2d 1080:

"In the instant case, the landowners contend the testimony was admissible as it had a direct bearing on the market value of the land. It is true that the sand deposits had a bearing on the market value of the land. The question for determination was the value of the land, not the value of the sand beneath the surface. It was proper to show the quantity and quality of the sand, and these elements could be considered in arriving at the value of the land as a whole . . ." (p. 688.)

Taking into account the nature of the leasehold in the instant case, viewed in perspective with the authorities heretofore cited and the rules therein stated, the testimony of Don Moehring taken as a whole was properly before the jury for its consideration. The whole record was before the jury and disclosed the various factors considered by Mr. Moehring and by the other witnesses and the similar valuations placed upon the leasehold by such other witnesses. Each of the witnesses first arrived at an evaluation on an acre basis, ranging between $1,800 to $2,000 per acre, and from this figure proceeded to determine the fair market value of the lease.

In accordance with the decisions of this court, the appellee introduced evidence of the quantity and quality of the sand and gravel present in the leasehold. Evidence concerning the location and accessibility of the lease in regard to available markets was shown. Further evidence was introduced showing the size and natural features of the leasehold. For this evidence, the appellee secured and relied upon witnesses who were thoroughly familiar with such matters. These men were trained by schooling, experience or both. They knew the problem.

Appellant asserts the trial court erred in its refusal to permit full cross-examination of appellee's expert witnesses as to the method used in computing market value. Its only complaint concerns the testimony of P. R. York. On *voir dire* examination counsel for appellant interrogated Mr. York as follows:

"Q. Is the opinion of value that you are going to give, Mr. York, is it based on the amount of yards of material that Mr. Mohring estimates was there and projected on a so-much-per-ton basis and the value given on that, or are you

going to give an opinion of fair market value based on what you sand men would pay for the lease?

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"A. Yes, sir. I have based my opinion on the value of that through the location of this lease, the quantity, the quality and the fair market price that will surround this lease.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Did you arrive at that, then, through some method of multiplication time the cubic yards that was stated here, times a dollars and cents figure, to arrive at your answer, is that right?
"A. No, sir."

Mr. York then testified on direct examination that a thorough test of the sand lease must be made to evaluate the quality and quantity before undertaking development of the lease. This is usually done by engineers. Sites in the southeast part of Wichita are very scarce and location is very essential. "You get as close as you can to your market for your transportation costs." He then testified:

"I was on the Eisenring lease in 1954 and 1955 on several occasions. Eisenring had a roadway to about the middle of the tract to handle loading. He had part of it already scalped, cleaned for pumping and a lake ready to float and produce. The location was good, close to two good highways, the markets close to it included McConnell Air Base and Boeing and Midland Industrial District. The quality of the sand was fine.

"The Turnpike went through the middle of the operation, and cut the tract into two pieces. The north part is inaccessible and the remaining part on the south is too small for economical operation."

On cross-examination pertinent interrogation before the trial court was as follows:

"Q. Mr. York, how did you arrive at the valuation that you placed on this Eisenring lease, would you explain to me the process that you went through to arrive at your figure of $52,460?

"Mr. Kamas: There is no law that requires him to break it down that minutely.

"The Court: Sustained.

"Q. I want to know how you arrived at your opinion, what was the process that you went through to arrive at the total figure of $52,460.

"The Court: You may answer that.

.  .  .  .  .  .  .  .  .  .  .  .  .

"Q. 'How did you arrive, Sir, at the $2,000 per acre? What caused you, in forming your opinion, to arrive at $2,000?

"A. I took into consideration the leasehold location, the market and the quality and quantity of the sand in the hole, and arrived at that figure.

"Q. Well, did you do some multiplication to arrive at that, or how much value did you place on a cubic yard of sand, for example, to get this up to $2,000?

"Mr. Kamas: Counsel very well knows that is not a proper question.

"The Court: Sustained. [1]

"Q. Then what basis did you have for arriving at $2,000? Is it just a guess?

"Mr. Kamas: To which we object. It has been already asked and answered twice.

"The Court: I will let him answer that, how he arrived at the $2,000 per acre.

"A. This location, the distance between the market, the quality and the quantity, the depth of this leasehold land is the way I arrived at this $2,000 per acre.

"Q. Did you put a value on the depth of the sand? What factor did you use in arriving at $2,000 an acre?

"Mr. Kamas: Now counsel wants us—

"The Court: I am going to sustain the objection. [2]

"Mr. Kamas: I might say that if counsel wants us to go into the yardage and values, we would be very glad to do so.

"The Court: I sustained the objection.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And you worked the figures out from the area and the depth and figured how much profit he could have made on it and used it in that fashion? Used in that fashion to establish your estimate?

"Mr. Kamas: We object to the form of the question.

"The Court: Sustained." [3]

The witness stated on voir dire that he did not use the number of cubic yards of sand multiplied by the price per yard to arrive at his opinion as to value. Both on direct and cross-examination he stated the factors used in determining his opinion as to value. On cross-examination counsel for appellant attempted to force an answer contrary to his statement on voir dire. On cross-examination the witness answered how he arrived at $2,000 per acre several times and the objections were properly sustained. As to the rulings of the court (numbered in brackets), No. 1 properly sustained the objection to a question improper in form, the second alternative of which assumed a fact which the witness had not stated in evidence; No. 2 properly sustained the objection since it was a multiple question, improper in form, and was repetitious as to the last portion; and No. 3 properly sustained the objection as to the form of the question—it assumed facts not in evidence and was argumentative.

While great latitude should be given counsel on cross-examination, the record discloses that appellee's witnesses were subjected to extensive cross-examination. Mr. York was examined by counsel for the appellant at great length. Upon careful examination of the record as abstracted, there is no affirmative showing that the trial

court abused its discretion, and its rulings will not be disturbed on appeal. (*Unruh v. Kansas Turnpike Authority,* supra.)

We conclude that appellee's witnesses were eminently qualified as experts to give their opinion concerning the fair market value of the lease in question upon all the factors and circumstances, fully disclosed by the record, taken into consideration in formulating such opinion.

The verdict of the jury is amply supported by substantial competent evidence and must stand. (*Stephenson v. Wallis,* 181 Kan. 254, 311 P. 2d 355.) It follows that the judgment of the lower court upon the verdict should be and hereby is affirmed.