No. 48,682

In the Matter of the Petition of Central Kansas Electric Co-operative, Inc., A Corporation, to Exercise the Right of Eminent Domain for the Transmission of Electric Energy

(582 P.2d 228)

Opinion filed July 15, 1978.

*Boyce P. Hardman,* of Diets & Hardman, of Great Bend, argued the cause, and *Raymond L. Dahlberg,* of the same firm, was with him on the brief for appellant.

*Thomas J. Berscheidt,* of Ward & Berscheidt, of Great Bend, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by the condemnor in an eminent domain proceeding from a jury award of $25,000.00.

Appellant, Central Kansas Electric Cooperative, Inc., found it necessary to construct a 69,000 volt transmission line approxi-

mately nineteen miles in length starting eleven miles north of Kinsley and running to a point southeast of Larned. The route of the proposed line ran along the north border of a quarter section of farm land owned by Stanley R. and Rebecca Z. Clowers and Warren A. and Phyllis L. Zook. Appellant was unable to negotiate a purchase of the necessary easement and resorted to eminent domain proceedings. The land in question (the Zook quarter) was a short quarter of less than 160 acres of which 110 acres were under cultivation, 40 acres were pasture, 3 to 5 acres were used in a swine raising operation and the remainder was occupied by the farmhouse and outbuildings. Along the north property line was a shelter belt and, in order to preserve it, the transmission line was located to the south, or inside of, the shelter belt. The pigpens were located just south of the shelter belt and the proposed electric transmission line was to be located over five of the pens.

Appellant, in attempting to negotiate the purchase of the easement, had offered $1,745.00 to the landowners. When this offer was refused, appellant commenced proceedings in the district court to obtain the easement by condemnation. Appellant and the landowners were dissatisfied with the award of the court-appointed appraisers and both filed notices of appeal. On the day that trial was to begin the landowners announced they were dismissing their appeal.

The jury returned a verdict of $25,000.00 for the landowners and the power company appeals. In addition to the jury award, the court allowed the landowners an additional $6,871.31 for attorneys' fees and costs incurred during the trial and further ordered that the landowners attorneys' fees and costs for the appeal to this court should be charged as costs and assessed to the condemnor.

By the time the case came to trial the electric transmission lines had been installed and the actual land occupied by the poles, guylines and other supports was only a small fraction of an acre. The electric transmission lines were installed at a height that does not physically interfere in any way with the use of the surface for normal farming operations or the existing swine producing operation.

Appellant proceeded upon the theory that the measure of damages was the difference in the fair market value of the Zook quarter before and after the taking of the necessary easement. The

landowners contended throughout the proceedings that their swine producing operation was unique, that the taking of the easement constituted a complete taking of the affected property, and there was no measurable market value for their type of operation. Appellees presented evidence showing the shelter belt furnished a natural barrier from the elements which was necessary for the successful raising of young pigs. They contended the electric power lines would generate an "electric field" below the lines that might be harmful to the pigs and that the power lines would allow birds, while perching on the lines, to defecate into the pigpens thereby possibly exposing the pigs to an increased danger of disease. For these two reasons the landowners felt they might be required to move the swine operation and construct a shelter for the pigs at an estimated cost in the neighborhood of $38,000.00. The trial court instructed the jury on both contentions, that is, the before and after market value and the theory that due to the use made of the property, it was unique and had no measurable market value.

The points raised on appeal and the arguments propounded by the parties require a rather detailed resumé of the evidence.

Appellee Warren A. Zook grew up in Pawnee County, wanted to go into the swine production business and in 1972 purchased the quarter section in question for $39,500.00 in partnership with Mr. and Mrs. Clowers. One of the factors considered in purchasing the property was the existence of the shelter belt which would afford some protection to the baby pigs during inclement winter weather. Zook testified at length, over repeated objections, about his swine operation and his fear that birds perching on the electric transmission lines would defecate into his pigpens, which might be a source of disease. He acknowledged that the birds (mostly starlings) roosted in the shelter belt, had come into the pens to feed and water prior to the installation of the lines and on occasion there had been as many as 200 to 300 feeding on the ground. He was also fearful that the lines would generate some type of "electric field" that might be harmful to the pigs and for these two reasons he thought he might want to move his swine operation from under the lines, resulting in the loss of the protection afforded by the shelter belt. If he did so, he estimated the cost to construct a partial shelter for the pigs to be approximately $38,000.00. On cross-examination he testified the quarter

section, if used as ordinary agricultural land, was worth $75,000.00 before the taking of the easement and after taking was worth $1,745.00 less.

A major portion of the testimony, over appellant's repeated objections, was devoted to the possibility of an increased health hazard to Zook's pigs due to birds perching on the electric transmission wires and defecating into the pens.

The leading witness called by the appellees, as to any possible additional hazard of disease carried by birds, was Dr. Harry D. Anthony, a member of the faculty of the College of Veterinary Medicine at Kansas State University. Dr. Samuel Kruckenburg, a colleague of Dr. Anthony's on the faculty of the College of Veterinary Medicine, Department of Veterinary Pathology, at Kansas State University, was called as a witness by the appellant.

A synopsis of the testimony of Dr. Anthony and Dr. Kruckenburg was that they had each viewed the Zook swine operation, the shelter belt and the 69,000 volt transmission line constructed by appellant on the Zook quarter; that the Zook swine operation was fairly typical of the majority of swine operations in the State of Kansas; and that appellees' hogs were fed in the open by placing grain on the ground and the waterers were open.

These witnesses testified there are three things that attract birds to a particular location—food, shelter and water—and that the Zook swine operation had all three attractions.

Both witnesses testified that an electric line is not an attraction for birds. Each distinguished what is meant by roosting and what is meant by perching. A roosting place is one such as the shelter belt where birds go to stay at night or for long periods of time while a perching place is one where birds just light or perch for a short time. Both testified a bird might perch but would not roost on an electric line.

Each witness was of the opinion that birds could transmit disease by landing in a pig lot which had been contaminated and then flying to and landing in another pig lot. Neither had personally confirmed transmission by bird feces of any diseases to feed lots in Kansas, but testified various people had suggested this was possible and the possibility was generally accepted by the veterinary profession.

Dr. Kruckenburg testified birds will pick at hog defecation, grain or anything else, and enclosed feeders and waterers would

be an additional precaution if one feared transmission of disease by birds. To obtain maximum control in disease prevention, it would be necessary to have an all-enclosed structure.

Dr. Anthony testified a structure over the pens on which a bird would perch could be an additional factor with respect to the potential hazard of disease. He had no knowledge and no opinion whether the electrical field surrounding the wires on the appellant's transmission lines would permit birds to perch and, even if they should perch on the lines, it would constitute no more than an added factor concerning disease. He had no opinion whether the added hazard would be one percent, one-tenth percent, or what it would be and then stated any opinion he might have would be only a guess. Dr. Kruckenburg testified if the birds did perch on the electric lines, any additional danger of transmission of disease by reason thereof would be almost infinitesimal as the birds would already be in the pigpens eating, drinking and defecating while they were on the ground. It was also brought out that the shelter belt itself extended over some of the pens and provided a place for the birds to roost as well as perch.

Dr. Arthur Darrell Apley, a graduate of Kansas State School of Veterinary Medicine, had been in practice for twelve years in Larned. He was familiar with the Zook swine operation, had done work for Zook, was of the opinion birds do transmit disease, and if birds were to perch on the electric lines, there would be some droppings, which would be a factor to consider. He also testified the lines would not attract additional birds to the area in that the three attractions, food, water and shelter, were already present at the Zook operation.

The landowners, in support of their contention that the electric transmission lines would create an electric field below the lines that might endanger the health of the pigs, presented testimony by Gary Lee Johnson, an associate professor at Kansas State University. Dr. Johnson held degrees in mechanical engineering and specialized in power transmission lines. Dr. Johnson testified that the electric transmission lines would create an electric field below the lines and, in his opinion, would be a danger to the pigs. Dr. Johnson acknowledged he had no experience as to the effect of electric fields on animals and his opinion was based solely upon four studies he had reviewed, which dealt with the effects of electrical fields on mice and men. On cross-examination it was

established that Dr. Johnson had no training in veterinary medicine, biology or zoology. It was also established that in all four studies, relied upon by Dr. Johnson, the results were either inconclusive or showed no damage to the humans and mice exposed to the electric fields even though the fields measured in the studies were many times more powerful than any possible field that could be generated by the transmission lines in question. The opinion given by Dr. Johnson was purely his personal opinion and was not supported by the four authoritative studies, which he testified formed the basis for his opinion. The testimony, at best, was speculative, conjectural and remote and should have been stricken upon appellant's motion. (See *Yagel v. Kansas Gas & Electric Co.,* 131 Kan. 267, 291 P. 768 [1930]; *Telegraph Co. v. Bridge Co.,* 89 Kan. 418, 131 P. 143 [1913].)

Appellant called Douglas Owen Procter in answer to the testimony of Dr. Johnson. Procter held an electrical engineering degree from the University of Illinois and was a designer of electric transmission lines. He testified as to the degree of the electric field that would be generated by the lines over the Zook quarter, that he was familiar with the studies referred to by Dr. Johnson, and he was of the opinion the electric field would have no effect whatsoever on the pigs.

Appellant presented two witnesses as to the before and after value of the Zook quarter. Edward Frizzell testified he was a member of the American Institute of Real Estate Appraisers, the National Association of Real Estate Boards, had approximately twenty-five years' experience in appraisal work, had made thousands of appraisals and had appraised from two to three hundred quarter sections of land in Pawnee County. He had appraised the Zook quarter, viewed the electric transmission poles, the lines and the farm operation, considered the few acres used for the swine operation, checked comparable sales and values and was of the opinion the Zook quarter had a fair market value of $77,500.00 prior to the taking of the easement and a value of $75,000.00 after the taking. He was of the opinion that the use of a small portion of the property for the production of pigs was no different than any other farm operation such as the raising of cattle. His opinion was based upon the market value of the property including improvements.

Russell Dipman testified he was a retired farmer, raised in

Pawnee County, had been head of the Agricultural Adjustment Administration of Pawnee County, had been a County Commissioner of Pawnee County for sixteen years, had previously appraised fifty to sixty parcels of land in Pawnee County, was familiar with the Zook quarter, had appraised it, that the land had a market value of approximately $500.00 per acre, and the value of the entire quarter was diminished about $1,000.00 because of the power line.

Appellant's principal point on appeal concerns the proper measure of damages. It is appellant's position that it was error for the trial court to admit any testimony or evidence other than that relative to the difference in value of the entire property immediately before the taking and the value of the portion remaining after the taking. Appellant contends the proper measure of damages is controlled by K.S.A. 26-513. Subsection (c) of the statute provides:

> "(c) Partial taking. If only a part of a tract of land or interest is taken, the compensation and measure of damages are the difference between the value of the entire property or interest immediately before the taking, and the value of that portion of the tract or interest remaining immediately after the taking."

Subsection (d) sets forth certain factors to be considered in arriving at a proper measure of compensation and damages under subsection (c).

The landowners contend their property was being utilized for a unique and special purpose (swine production), and, as such, had no market value and therefore a different measure of damages must be utilized. Appellees rely on *Eisenring v. Kansas Turnpike Authority,* 183 Kan. 774, 332 P.2d 539 (1958), and *City of Wichita v. Unified School District No. 259,* 201 Kan. 110, 439 P.2d 162 (1968). *Eisenring* is the Kansas case most frequently cited and relied upon when it is contended that, due to a special use, property has no market value. In *Eisenring* the appellee was lessee of a 26.36 acre sand and gravel lease near Wichita. The term of the lease had only fourteen months remaining when the Kansas Turnpike Authority took a right-of-way through the middle of the leased property. Eisenring presented testimony as to the production from the leased premises, reserves, existing market for sand and gravel, and the before and after value of the lease. It was the position of the Turnpike Authority that since sand leases are not traded in commerce, there could be no damages. In *Eisenring,* we held:

"In the absence of market value, in the sense that the special type of property is not commonly bought and sold, resort must be had to the testimony of more specialized experts. The value of property for a special use to which it is adapted or put may be shown by persons familiar with such use, even though they are not familiar with land values generally. If a witness, by reason of his skill, learning or technical training, understands the adaptability of the lands in question for a particular purpose and the demand for land for such purpose, he may state the market value of the property." (*Eisenring v. Kansas Turnpike Authority,* supra, Syl. ¶ 2.)

It should be noted that in *Eisenring* all of the expert witnesses were eminently qualified in the realm of sand and gravel leases and each testified as to the before and after value of the leasehold estate. In the case at bar none of the expert witnesses called by the landowners testified as to values of the Zook quarter, either as an ordinary farming operation or as a swine producing facility. Their testimony was limited to the possibility of hazard to the pigs from defecation by birds perching on the electric transmission lines and the electric field generated by the lines. The only evidence as to value presented by the landowners was the testimony of Zook that the market value of the property as farmland had been diminished by $1,745.00.

Appellee's also rely on *City of Wichita v. Unified School District No. 259,* supra. There a school building in Wichita was taken by condemnation for interstate highway purposes and the dispute was over the correct method of ascertaining just compensation to the school district. The district contended it was entitled to the cost of replacement while the city took the position that the proper measure of compensation was either the market value of the property or the replacement costs less depreciation and obsolescence. In referring to *Eisenring,* Justice Fontron, speaking for a unanimous court, stated:

"Although the property involved in the Eisenring case was not a public school house, but a leasehold interest in a private sandpit, the undergirding principles of that decision would seem equally applicable where public property belonging to one unit of government is coveted and seized by another governmental body to be put to a different and, no doubt, superior public use. It appears to be well recognized in jurisdictions where the question has arisen, that school houses, churches, court houses and the like are special purpose properties not ordinarily bandied about in the market place, and hence a test other than market value must be employed in ascertaining their worth. Among the text writers also there is general agreement on this point.

"In 4 Nichols on Eminent Domain (3rd Ed.), § 12.32, we find this discussion:
    'It occasionally happens that a parcel of real estate taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, if he desired to dispose of it he would be unable to sell it at anything like its real value. A church, or a college building, or a club-house located in a town in which there was but one religious society, or college, or club, might be worth all it cost to its owners, but it would be absolutely unmarketable. . . .' (pp. 217-218.)
    'Where a building is a speciality, and, in a sense, unique, being constructed for a special use, the valuation cannot be predicated on the same basis as a building constructed for general or usual dwelling or commercial use. In the case of a speciality there is a limited market and the customary testimony of market price is not available. It has been held under such circumstances that reproduction cost or replacement cost may be considered. . . .' (pp. 227-228.)" *City of Wichita v. Unified School District No. 259,* 201 Kan. at 113-114.

The court found the rule to be that where property already devoted to a public use by one agency of government is condemned by another agency for some unrelated public purpose just compensation consists of the cost of providing equivalent substitutes or necessary replacements for the property taken. The same measure of compensation has been applied to the taking of private property where evidence of fair market value was lacking due to the unique use of the property. (See *United States v. 531.13 Acres of Land, Etc.,* 244 F. Supp. 895 [W.D. S.C. 1965]; *Albany Country Club v. State,* 241 N.Y.S.2d 604, 19 A.D.2d 199 [1963].)

We have no quarrel with the rules laid down in *Eisenring* and *City of Wichita v. U.S.D. No. 259.* However, we are of the opinion they do not apply in the instant case. The properties taken in the cases cited were truly unique or special purpose properties for which there was no ready market. The same is not true of the Zook quarter. The use made of a small portion of the Zook quarter was nothing more or less than adapting the acreage to a form of agricultural usage common in the area. The use of the property for swine production is no more unique than would be the production of cattle, poultry, sheep or some other operation which might involve the use of special buildings or location. The use of farm property for such common agricultural purposes is not to say the property has no general market value which may be determined by competent appraisers.

In *City of Wichita v. May's Company Inc.,* 212 Kan. 153, 510 P.2d 184 (1973), in considering K.S.A. 26-513, we stated at page 156:

"K.S.A. 1972 Supp. 26-513(*d*) lists fifteen factors which may be given consideration when shown to exist, but points out the fifteen factors are not to be considered as separate items of damages, but are only to be considered as they affect the total compensation to be determined as directed in subsection (*c*).

"Subsection (*c*) specifically sets out the measure of damages in a condemnation case when a partial taking occurs. It is plainly stated the measure is the difference between the value of the entire property or interest immediately before the taking and the value of the remaining property immediately after the taking. Prior to the effective date of this statute, July 1, 1969, the courts of this state generally followed the same measure of damages as set forth in the statute. (*Humphries v. State Highway Commission,* 201 Kan. 544, 442 P.2d 475.) Since its codification, the courts have no alternative except to follow its directives. No exceptions are provided in the statute. In every partial taking there are only two issues—the value of the whole before the taking and the value of the remaining property after the taking. Evidence should be confined to these two issues.

"In order for the verdict of a court or jury to stand, the amount must be supported by the testimony. The 'before' value must be equal to and not more than the highest expression of opinion evidence, and the 'after' value must not be less than the lowest expression of opinion of the value of the remaining property after the taking. (*Kansas State Highway Commission v. Roepke,* 200 Kan. 660, 438 P.2d 122.) If the court or jury, in determining a condemnation award, has no competent admissible testimony on each of these values, an award or verdict cannot stand."

It is inconceivable that a quarter section of good Kansas farmland would not have a market value solely because of the type of agricultural pursuits followed thereon. The proper measure of compensation and damages is controlled by K.S.A. 26-513(*c*) and (*d*) and testimony should have been limited to the before and after value of the Zook quarter as mandated by the statute. That is not to say that the use of the property cannot be considered in determining the before and after value. (K.S.A. 26-513(*d*) 1 and 13.)

Giving the testimony in the case at bar the most liberal construction favorable to the landowners, the maximum difference in the before and after value was $2,500.00, as established by the witness Frizzell. As the verdict of the jury was not within the range of the testimony, it cannot stand. (*City of Wichita v. May's Company Inc.,* supra.)

Although the foregoing disposes of the appeal, as the case must be returned for a new trial, we deem it advisable to consider briefly other points raised by appellant.

The trial court instructed the jury on the theories of both parties, as follows:

"INSTRUCTION NO. 4

"The evidence in this case has established that only part of the owners' land was taken. The amount actually taken was less than one acre, leaving a remainder of more than one hundred fifty-nine acres.

"The power company contends that there does exist a measurable market for the land which was taken. If you are persuaded that this is true, then the measure of compensation under such circumstances is the difference between the market value of the entire property or interest immediately before the taking and the market value of that portion of the property interest remaining immediately after the taking. The date of taking was October 1, 1975. Thus, you should arrive at the total compensation due the property owners as follows:

First, you should determine the market value of the entire property and interest immediately before the taking.

Second, you should determine the market value of the remaining property and interest immediately after the taking.

Third, you should determine the difference between the two amounts by subtracting the second from the first, which difference will be the amount of your award.

"In determining the amount of compensation which should be awarded to the property owners, you should consider all of the factors actually bearing upon value, which value evidence was shown to exist. These factors include (a) the most advantageous use to which the property is reasonably adaptable; (b) the productivity, convenience or use to be made of the property taken or use of the property remaining and (c) the fact that the property could be or had been adopted to a use which was profitably carried on. You should consider such factors, not as separate items, but only as they affect the entire market value. These factors must be real, not speculative, conjectural or remote.

"The property owners contend that the property herein involved is not property of a kind that is customarily bought and sold and that it, therefore, has no measurable market value. If you are persuaded that this is true, then you must use a different measure of compensation in lieu of market value and to determine the amount of your award, you may consider the value of the property to the property owners for their special use or purpose, or for any purpose to which the property is reasonably adaptable. These special uses or purposes must be real, not speculative, conjectural, or remote."

The last paragraph of the instruction is taken from PIK Civil 11.06 and, while a correct statement of the law, should be utilized only when the property is unique or of such a special nature that it has no measurable market value. In view of what has been said previously, and as there was a demonstrable market value for the property, the last paragraph of the quoted instruction should not have been given. (See *Skelly Oil Co. v. Urban Renewal Agency,* 211 Kan. 804, 508 P.2d 954 [1973], *Hoy v. Kansas Turnpike Authority,* 184 Kan. 70, 334 P.2d 315 [1959].)

The remainder of the instruction was taken principally from PIK Civil 11.04 and the use of 11.04 would have been proper under the evidence in this case.

Next, appellants contend it was error to allow testimony from experts as to the possible effects of birds defecating into the pens while perching on the wires and the electric field generated by the wires on the health of the pigs. While the admission of expert testimony is ordinarily within the sound discretion of the trial court, a witness must have skill or experience in the matter to which the subject relates. (*Choo-E-Flakes, Inc. v. Good,* 224 Kan. 417, 580 P.2d 888 [1978].) Neither of the engineers had any expertise in determining the possible effect of the electric field upon pigs and such testimony should not have been allowed, over proper objection, or should have been stricken and the jury instructed to disregard it. The same is true as to the testimony of the numerous veterinarians who testified as to the possible effect of birds perching on the power lines and defecating into the pigpens. While the witnesses were undoubtedly qualified in the field of animal disease, the testimony as to any harmful result was too remote and speculative to be competent evidence in this case.

Finally, appellant questions the allowance of attorney fees and expenses to the landowners. Both parties in this case appealed from the court-appointed appraisers' award. The landowners, in what would appear to be an attempt to place them in a position to request attorneys fees under K.S.A. 26-509, announced five minutes before going to trial that they were dropping their appeal. The statute limits the allowance of attorney fees to those cases where the condemnor has appealed and in which the jury renders a verdict in an amount greater than the appraisers' award. In *City of Wellington v. Miller,* 200 Kan. 651, 438 P.2d 53 (1968), we held that an appeal in a condemnation case could not be dismissed over the objection of any party having an interest in the tract. Under the circumstances of this case and the attempted dismissal by the landowners, it was error to allow attorney fees to the landowners when they had originally been appealing parties.

The judgment is reversed and remanded for a new trial in accord with the views expressed herein.