(629 P.2d 196)
No. 51,030

UNIFIED SCHOOL DISTRICT No. 490, BUTLER COUNTY, KANSAS, *Plaintiff-Appellee,* v. THE CELOTEX CORPORATION, *Defendant-Appellant,* and SUNFLOWER ROOFING AND INDUSTRIES, INC., *Defendant-Appellee.*

Petition for review denied July 16, 1981.

Opinion filed May 29, 1981.

*John D. Jones,* of Greene, Buckley, DeRieux & Jones, of Atlanta, Georgia, and *Jerry W. Hannah,* of Hannah and Focke, of Topeka, for defendant-appellant.

*Wayne T. Stratton* and *Harold S. Youngentob,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka, and *Fred W. Rausch, Jr.,* of Topeka, for plaintiff-appellee.

*O. J. Connell, Jr.,* of Connell & Connell, of El Dorado, for defendant-appellee.

Before ABBOTT, P.J., REES and SPENCER, JJ.

ABBOTT, J.: This appeal is from a judgment entered in an action by Unified School District No. 490, Butler County, Kansas (USD 490), for both actual and punitive damages, claiming the defendant The Celotex Corporation (Celotex) sold and Sunflower Roofing and Industries, Inc. (Sunflower), had installed a two-ply, built-up roofing system on the El Dorado High School building. USD 490 claimed recovery for fraud and breach of warranty. The jury returned a verdict in favor of USD 490 in the amount of $100,000 compensatory damages and $600,000 punitive damages. The compensatory damages were apportioned between Celotex and Sunflower, attributing $98,000 to Celotex and $2,000 to Sunflower. All of the $600,000 punitive damages award was assessed against Celotex. On the cross-claim of Sunflower against Celotex on a theory of fraud, the jury awarded Sunflower actual damages of $15,000 and punitive damages of $28,000. Celotex appeals from the judgment, alleging numerous errors.

To understand the issues, it is necessary to give some background of the events that occurred prior to the planning of the new high school at El Dorado. Most of the background is found in the voluminous record (more than 2,000 pages, and in excess of 200 exhibits), and some was furnished at oral argument. Barrett

Roofing Company (Barrett) was an established and well-respected manufacturer of roofing materials. At some unspecified time prior to this controversy, Barrett was purchased by Allied Chemical Corporation (Allied) and became the Barrett Division of Allied Chemical Corporation. The Barrett Division of Allied was not a separate corporation. In the late 1950's or early 1960's, the Barrett Division of Allied developed a two-ply, built-up roofing system. Prior to that development, the most commonly used built-up roofing system incorporated four plies of felt saturated with asphalt, which were applied in alternating layers. Each ply was mopped with hot asphalt and covered by a flood coat of hot asphalt into which gravel was embedded. Such a roof normally could be expected to give 20 years or more of satisfactory service. Allied referred to its new two-ply system as the Bond Ply system. When Allied began marketing the Bond Ply system in 1964, it advertised the system extensively as $1 + 1 = 4$; *i.e.*, that the two plies of Bond Ply equaled the conventional four-ply roof. The two-ply system was considerably more profitable to Allied than the existing four-ply roof system. The record reflects evidence that at least some experts of Allied were skeptical of the two-ply system prior to 1964, and that considerable difficulty was encountered with installed two-ply roofs, particularly in climates that experienced severe winter weather.

A number of significant events took place in 1967. At some point during the year, prior to August 31, 1967, Allied sold the Barrett Division to Celotex, a subsidiary of The Jim Walter Corporation. The sale was made pursuant to an agreement that Celotex assume all liabilities which the Barrett Division had as to previous sales. Following its purchase, most of the employees of the Barrett Division of Allied continued in the employment of Celotex. On March 21, 1966, USD 490 had employed The Shaver Partnership (Shaver) to provide architectural and engineering services for a new high school. Shaver then contracted with Prigmore & Allen, architects, for a portion of those services. Shaver specified the two-ply system for use on the high school roof. John Shaver testified he relied on representations of Celotex's roofing specialists that the two-ply system was equal to or greater in strength and durability than the four-ply system. On May 4, 1967, USD 490 entered into a contract with Coonrod, Walz & Vollmer Construction Company, Inc. (Coonrod),

whereby it agreed to construct the El Dorado High School building. Coonrod contracted with Sunflower to roof the high school building. The materials used in the roofing included adhesive, asphalt, insulation and roofing material manufactured and supplied by Celotex.

The high school was occupied by USD 490 in the fall of 1968, and leaks developed shortly thereafter. In 1970, the roofing material began to split. Considerable money and effort were expended in an attempt to correct the roofing problems, all without success. Experts were employed by the school district in May of 1975 to determine the cause of the roofing problems.

USD 490 commenced this action on September 9, 1976. Of the multitude of pleadings filed, the only filing dates material to this case relate to Sunflower's cross-claim against Celotex. Sunflower filed an answer on October 13, 1976, to USD 490's petition. The answer requested indemnity from Celotex if Sunflower should be determined to be liable to the school district. Sunflower next filed on May 19, 1978, what is labeled a cross-claim against Celotex. As we read that pleading, it amounts to nothing more than a prayer for indemnity from Celotex. A pretrial order was filed on October 20, 1978, in which Sunflower alleged that Celotex engaged in a course of conduct designed to prevent Sunflower from receiving knowledge of defects in the roofing material. On January 5, 1979, seventeen days prior to trial, Sunflower filed a second amended cross-claim against Celotex for fraud and requested actual and punitive damages. Celotex answered, setting up the statute of limitations as a defense to the cross-claim. Further facts will be supplied as they become relevant to the discussion of the various issues raised on appeal. Celotex raises 26 separate issues, some of which are more than a single issue. We have consolidated a number of the issues, and those not specifically mentioned herein have been examined and found to be without merit.

Celotex argues that the claims of USD 490 and Sunflower are barred by the applicable statutes of limitation. The roof began leaking in 1968 almost simultaneously with occupancy of the building. A series of repairs began in 1969 and ran for almost ten years. Two separate statutes apply.

The statute of limitations applicable to a claim sounding in breach of warranty is found in K.S.A. 84-2-725, which provides:

"(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . .

"(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

The statute of limitations for claims arising out of fraud is found in K.S.A. 60-513(*a*), and provides in pertinent part:

"The following actions shall be brought within two (2) years:

. . . .

"(3) An action for relief on the ground of fraud, but the cause of action shall not be deemed to have accrued until the fraud is discovered."

We conclude that the statute of limitations did not run against USD 490. Statutes of limitation do not run against the state when the action arises out of the performance of a governmental function. *State ex rel. Schneider v. McAfee,* 2 Kan. App. 2d 274, 275, 578 P.2d 281, *rev. denied* 225 Kan. 845 (1978); K.S.A. 60-521. The construction of a school building is incidental to and a part of the state's overall duty to provide public education for the citizens of the state. 2 Kan. App. 2d at 276. The operation of a high school building by a school board is a governmental function. See *Smith v. Board of Education,* 204 Kan. 580, 584, 464 P.2d 571 (1970). Celotex argues that the reasoning behind *Gorrell v. City of Parsons,* 223 Kan. 645, 576 P.2d 616 (1978), should work to overrule decisions such as *State ex rel. Schneider v. McAfee* that have governmental immunity as their basis. We need not pass on the validity of this extended application of *Gorrell* in the case before us since Celotex raised this issue for the first time in its brief on appeal. *Fleming v. Etherington,* 227 Kan. 795, Syl. ¶ 7, 610 P.2d 592 (1980). In any event, *Gorrell* and *Thome v. City of Newton,* 229 Kan. 375, 624 P.2d 454 (1981), each held a municipality subject to suit for certain tortious acts committed during the performance of a government function but their reasoning does not extend to imposition of time limitations upon public bodies for the institution of actions.

Sunflower is in a vastly different position. It concedes that a cross-claim asserting an affirmative claim must be filed within the applicable period of the statute of limitations. See *Belger Cartage Serv., Inc. v. Holland Constr. Co.,* 224 Kan. 320, 331-32, 582 P.2d 1111 (1978); *Rochester American Ins. Co. v. Cassell Truck Lines,*

195 Kan. 51, 402 P.2d 782 (1965). It alleges, however, that it could not have discovered the fraud that is the subject of the cross-claim until it began discovery in the case in 1978. It relies on K.S.A. 60-513(a)(3) and *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974), for its authority that a cause of action does not accrue for fraud until the fraud is discovered. In essence, Sunflower argues that fraudulent concealment by Celotex prevented it from learning of the fraud. A very similar argument was recently considered by the Kansas Supreme Court in *Friends University v. W. R. Grace & Co.,* 227 Kan. 559, 564-65, 608 P.2d 936 (1980):

"Finally, Friends contends the failure of W. R. Grace to disclose the crawling of other roofs and the development of the Zonolite nail constituted fraudulent concealment which tolled the statute of limitations. Friends argues the company knew the roof was a total failure and should have disclosed said information. This doctrine is discussed in 51 Am. Jur. 2d, Limitation of Actions § 148, pp. 719-721, as follows:

" 'To constitute concealment of a cause of action within the general rule tolling the statute of limitations on that ground the concealment must be fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designated to prevent, and which does prevent, discovery of the cause of action. There must be some actual artifice to prevent knowledge of the fact, some affirmative act of concealment, or some misrepresentation to exclude suspicion and prevent injury.

" 'Although mere silence or failure to disclose may not in itself constitute fraudulent concealment, any statement, word, or act which tends to the suppression of the truth renders the concealment fraudulent. In such cases, by adding to the original fraud affirmative efforts to divert, mislead, or prevent discovery, a continuing character is given to the original act which deprives it of the protection of the statute until discovery. Where some affirmative act of concealment takes place, it is not material whether the concealment was previous or subsequent to the accruing of the cause of action. The question is whether there was a design to prevent the discovery of the facts which gave rise to the action, and whether the act operated as a means of concealment.

" '*There can be no concealment* which will prevent the running of the statute of limitations *where the cause of action is known to the plaintiff or there is a presumption of such knowledge.* Where the defendant does not occupy a fiduciary or confidential relationship toward the plaintiff, neither affirmative nor passive conduct of the defendant will constitute such a concealment as to prevent the running of the statute of limitations, where through reasonable diligence on his part he could have learned of the existence of his cause of action. It has accordingly been held that the party seeking to toll the statute of limitations must explain why due diligence did not lead or could not have led to discovery of the facts and the cause of action.'

"In the case before us a new roof on a new building was leaking. The cause had to be defective design, materials, workmanship, or some combination thereof. At any time Friends could easily have obtained an expert opinion on the precise cause or causes for the leaking roof.

"We must conclude that the trial court did not err in granting summary judgment to defendants W. R. Grace & Co., and GAF Corporation on the ground the action was barred by the statute of limitations." (Emphasis supplied.)

Here, also, a roof on a new building was leaking. Sunflower could have obtained an expert opinion on the cause or causes for the leaking roof at any time, and it appears that the rule in *Friends University* applies to Sunflower in this case. See also *Grand Island School Dist. #2 v. Celotex Corp.*, 203 Neb. 559, 279 N.W.2d 603 (1979). In addition, USD 490 employed an expert to examine the roof in 1975 and he gave an opinion as to the cause of the leaks. Sunflower was then named a defendant by USD 490 in this lawsuit; the pleadings plainly set forth fraudulent misrepresentation or concealment on the part of Celotex. The cross-claim in question was not filed until January 1979. Even if a liberal construction would allow the cross-claim to relate back to the May 19, 1978, amended answer that is titled a cross-claim, the result would be the same. Sunflower had knowledge as early as 1968 that the roof was leaking. It was either improperly designed, or contained faulty material, or there was faulty workmanship on the part of Sunflower. As we view the Supreme Court's decision in the *Friends University* case, its interpretation of K.S.A. 60-513($a$)(3) requires some degree of diligence by any party claiming fraud, the exact degree to depend upon the facts of each case and the relationship of the parties. We thus are of the opinion, based on the record before us, that as a matter of law the statute of limitations had expired as to Sunflower's claim for actual and punitive damages. Admittedly, Sunflower's right to indemnity would not be barred by the statute of limitations (K.S.A. 60-213[$d$]); but the jury did not award damages to Sunflower on that basis and we are not directed to any instructions that were given or requested that would have allowed such an award. The judgment in favor of Sunflower and against Celotex in the amount of $15,000 actual and $28,000 punitive damages should be set aside and remanded to the district court with directions to enter judgment for Celotex on the basis that Sunflower's claims are barred by the statute of limitations.

Celotex next argues that it cannot be held liable for the misconduct of the Barrett Division of Allied and points out that the two-ply roof was developed and advertised by Barrett. Celotex further argues that it did not acquire Barrett until after the

architect had relied on advertising and specifications furnished by Barrett and on representations made by Barrett's salesmen. Although that argument is interesting, we cannot consider it; our answer is simply that Celotex did not raise that defense in the trial court, but tried the case on the theory that it was liable for Barrett's actions. The case was also argued to the jury on that theory. Having failed to raise the issue and having tried the case on the theory that it was liable for Barrett's actions, we are of the opinion Celotex waived that defense. K.S.A. 60-208(*c*); 5 Wright and Miller, Federal Practice and Procedure: Civil § 1278 (1969).

At oral argument, counsel for Celotex informed this court that at one time Celotex thought it was liable for any damages, actual or punitive, resulting from the conduct of the Barrett Division of Allied. Celotex no longer takes that position, but it comes too late for Celotex to benefit in this case. We acknowledge that there could arise a factual situation in which public policy is so strong that the court would not enforce a judgment in contravention of that public policy. Here, however, the conduct of the defense throughout the pleading and trial stages was that Celotex sold the material involved and so was subject to both actual and punitive damages. As a result, the school district wasted little time presenting evidence in several areas in which it obviously would have spent more time and effort if Celotex had raised the defense at trial that it now relies on.

Celotex next argues that public policy prohibits the assessment of punitive damages against a large interstate mass-marketer. It reasons that a mass-marketer of a product should not be subjected to a multiplicity of punitive damage verdicts in various jurisdictions when the alleged misconduct does not give rise to damages different in kind and degree from those suffered by all other users affected by the product. For authority on this point, Celotex cites *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967), in which the trial court struck down a punitive damage award of $100,000 to a person who had developed cataracts as a result of the defendant drug company's fraudulent marketing practices. That case outlines some potential drawbacks to extending the punitive damage remedy to products liability litigation: (1) The inequity of punishing the innocent shareholders of a manufacturer for the misdeeds of its low-level employees; (2) the probability that a manufacturer will insure against the risk of

punitive damage assessments, and the deterrent value of the remedy will thus be removed; and (3) the risk that a manufacturer may be excessively punished or perhaps even bankrupted by multiple punitive damage verdicts in various jurisdictions for marketing a single defective product.

While *Roginsky* certainly provides some support for Celotex's position, it is by no means dispositive of the issue. Alternative solutions exist that allow punitive damages to be awarded in a products liability situation without running into the problems that were anticipated in *Roginsky*. See Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1258 (1976). Restatement (Second) of Torts § 908(*e*) (1979) states in relevant part:

"Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards. In a class action involving all claims, full assessment of the punitive damages can be made."

In *Will v. Hughes,* 172 Kan. 45, 238 P.2d 478 (1951), the Kansas Supreme Court stated that a defendant has the right to consideration of any mitigating circumstances that might operate to reduce punitive damages without wholly defeating them (Syl. ¶ 10). See *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 686, 602 P.2d 1326 (1979); *Henderson v. Hassur,* 225 Kan. 678, 694, 594 P.2d 650 (1979). As USD 490 points out in its brief, Celotex had available numerous witnesses who for the purpose of mitigating the punitive damages here might have testified about the cases going on across the country with similar claims of punitive damages. Celotex, however, for tactical reasons, chose not to present such evidence to the jury. Although a considerable number of cases are pending, so far as we know only one punitive damage award against Celotex has been reviewed and affirmed by an appellate court as of this time (*Campus Sweater and Sportswear Co. v. M. B. Kahn Constr. Co., et al.,* [4th Cir.] No. 79-1724, decided February 26, 1981 [unpublished]). Based on the record before us, we do not find error on this issue.

Celotex presents the novel argument that the imposition of punitive damages against Celotex, an interstate mass-marketer, violates its constitutional guarantee of due process, its right to protection against double jeopardy, and subjects it to cruel and

unusual punishment. The imposition of punitive damage awards, although penal in nature, does not approach the severity of criminal sanctions and does not demand the same safeguards as do criminal prosecutions. See Comment, *Criminal Safeguards and the Punitive Damages Defendant,* 34 Univ. Chicago L. Rev. 408 (1967).

In arguing that successive punitive damage verdicts subject it to cruel and unusual punishment, Celotex relies upon the suggestion in a concurring opinion by United States Supreme Court Justice Frankfurter that the Eighth Amendment could protect against multiple civil penalties. See *U.S. ex rel. Marcus v. Hess,* 317 U.S. 537, 556, 87 L.Ed. 443, 63 S.Ct. 379 (1943). The United States Supreme Court, however, has recently ruled that the Eighth Amendment is generally limited to challenging conditions of a criminal sentence. See *Ingraham v. Wright,* 430 U.S. 651, 51 L.Ed.2d 711, 97 S.Ct. 1401 (1977). In our opinion, the Eighth Amendment does not apply to the facts before us.

Celotex argues that the $600,000 punitive damage award is excessive. The appellate scope of review in testing the excessiveness of an award of punitive damages is well settled. In the recent case of *Cantrell v. R. D. Werner Co.,* 226 Kan. at 686, the Kansas Supreme Court, in following *Henderson v. Hassur,* 225 Kan. 678, repeated these rules:

" 'The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. . . .'

"Where a charge of excessive verdict is based on passion or prejudice of the jury, but is supported solely by the size of the verdict the trial court will not be reversed for not ordering a new trial, and no remittitur will be ordered unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court."

Here, the evidence shows a calculated nationwide course of conduct. During the time the two-ply roofing system was on the market, Celotex realized enormous profits. Celotex consented to an instruction to the jury that its net worth was $538 million plus. If an individual worth $100,000 were assessed punitive damages on the same ratio as those awarded in the case against Celotex, the amount awarded would be only cents more than $111. We are unable to say the size of the verdict shocks the conscience of this court.

Celotex also raises another novel argument—that a public entity should not be entitled to recover punitive damages. It offers no real reason why this should be the case, and cites no meaningful authority to support its position. The general rule is that ordinarily a political corporation can avail itself of any legal remedy or any form of action that would be open to a private suitor under similar circumstances. *State v. Keach,* 145 Kan. 403, 406, 65 P.2d 598 (1937). Furthermore, punitive damages are imposed not because of any special merit in the injured party's case but to punish the wrongdoer for malicious, vindictive or willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs. *Cantrell v. R. D. Werner Co.,* 226 Kan. at 686. Since the purpose of assessing punitive damages is unrelated to the status of USD 490, Celotex's argument is without merit.

Celotex next argues that actionable fraud may not exist without privity of contract. It contends that the architects and contractors are independent contractors, thus representations made to them cannot be considered as having been made to the school district. A similar argument was made and rejected by the Kansas Supreme Court in *Griffith v. Byers Construction Co.,* 212 Kan. 65, 510 P.2d 198 (1973). Syl. ¶ 3 of that opinion states:

"One who makes a fraudulent misrepresentation or concealment is subject to liability for pecuniary loss to the persons or class of persons whom he intends or has reason to expect to act or to refrain from an action in reliance upon the misrepresentation or concealment."

*Griffith* specifically held that liability for misrepresentation is not necessarily limited by the doctrine of privity. In this case, USD 490 reasonably could have been expected to act or refrain from acting in reliance upon Celotex's representations. In addition, the architect testified he was acting as agent for the school district.

Celotex also argues that the jury erred in finding that defendant's actions constituted fraud. Our scope of review is limited. The Kansas Supreme Court stated in *Cantrell v. R. D. Werner Co.,* 226 Kan. at 684:

"It has long been the rule when the verdict is attacked for insufficiency of the evidence, 'the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing

court must review the evidence in the light most favorable to the party prevailing below.' "

In *Miles v. Love,* 1 Kan. App. 2d 630, 631, 573 P.2d 622, *rev. denied* 225 Kan. 845 (1977), this court held:

"The existence of fraud is ordinarily a question of fact. [Cite omitted.] As such, the extent of this court's review is limited to determining whether the trial court's finding is supported by competent evidence when that evidence is weighed in the manner most favorable to supporting the trial court's determination."

Kansas has previously determined that a manufacturer has a duty to warn customers of latent defects in its product. See *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976); *Steele v. Rapp,* 183 Kan. 371, 327 P.2d 1053 (1958). Not only did Celotex fail to warn USD 490 of the strength and durability limitations of its product, the record contains evidence that it misrepresented the quality of the product. The evidence shows that Celotex continued to use the advertising slogan "1 + 1 = 4" even as proof began to pour in that in many respects the roof did not meet that description. Further, Celotex failed to instruct its own salesmen on the drawbacks and limitations of the two-ply roof, which conduct insured that the ultimate consumer would not be informed. Though there is conflicting evidence on all of these points, it is not the function of·the appellate court to reweigh the evidence. Numerous witnesses testified at trial that Celotex represented to them that the two-ply roof was the functional equivalent of the four-ply roof, and that it would have a useful life of twenty years. This touting of the product, even with knowledge of its failures, amounts to a calculated misrepresentation. See *Independent Sch. Dist. No. 181 v. The Celotex Corp.,* 309 Minn. 310, 244 N.W.2d 264 (1976). The evidence is sufficient to infer that Celotex knew of its product's limitations, yet Celotex continued to sell it because of its profitability. It also establishes that Celotex engaged in fraudulent misconduct in representing that the roof had a given longevity, even though knowing it did not, and in further failing to warn consumers of the product's limitations. The Kansas Supreme Court has upheld a punitive damage award for very similar conduct in *Cantrell v. R. D. Werner Co.,* 226 Kan. at 686-87:

"In the case at bar the jury awarded plaintiff $18,500 in punitive damages. There was evidence that in at least five prior instances the front rails of ladders of the same model as the one used by plaintiff and manufactured by Werner had

collapsed in the same manner. There was also evidence that Werner had made design changes in order to strengthen the rails of the ladder by adding additional braces, that Underwriters Laboratories was withdrawing its certification unless corrective measures were taken, that defendant had notice of the ladder's weaknesses many months prior to the manufacture of the ladder in question, yet continued to manufacture and market the ladder even after corrective designs and measures had been determined and agreed upon with Underwriters. There was adequate evidence from which the jury might have found a reckless disregard of plaintiff's rights and the amount of the award for punitive damages does not shock the conscience of this court."

Having examined the voluminous record, we conclude that substantial competent evidence exists in the record to support a jury verdict against Celotex based on a finding of fraud.

Celotex next argues that the trial court erred in admitting evidence of other Celotex roof failures around the country, including documents relating to incidents that occurred after the sale of the roofing material in this case. The evidence of prior roof failures was not introduced by plaintiff to show that the two-ply roof of the El Dorado High School was defective, nor was it used to indicate that the causes of the problems on previous roofs were related to the causes of the problems on the El Dorado High School roof. The actual purpose of the introduction of these documents was to prove Celotex's knowledge of the defect that gave rise to the duty to warn. As to USD 490's breach of warranty and fraud theories of recovery, the evidence of prior complaints was also relevant to show Celotex's state of mind insofar as its representation is concerned and to prove Celotex's knowledge of its truth or falsity or its reckless disregard of its truth or falsity.

In civil actions, a trial court has wide discretion whether to admit evidence of similar acts or occurrences as proof that a particular act was done or a certain incident occurred, and its ruling thereon will not be disturbed on appeal absent a showing of abuse of discretion. *Frame, Administrator v. Bauman,* 202 Kan. 461, Syl. ¶ 3, 449 P.2d 525 (1969). In actions involving fraud, evidence of the same or similar fraudulent misrepresentations made to other than the party is competent and relevant for the purposes of establishing the elements of knowledge, motive and intent to defraud. K.S.A. 60-455. *Culp v. Bloss,* 203 Kan. 714, Syl. ¶ 3, 457 P.2d 154 (1969); *Hubin v. Shira,* 1 Kan. App. 2d 203, 563 P.2d 1079 (1977). It was essential to the school district's fraud case here to show the notice to Celotex of the deficiencies of the product and Celotex's continued fraudulent misrepresentation in

light of its knowledge of the product's weaknesses. Although Celotex makes much of the fact in its brief that the roofs and roofing problems in the other cases were dissimilar, all of the complaints introduced were about two-ply roofs. We also note that internal memoranda of Celotex made reference to the fault of the two-ply roof, regardless of how the problems were manifested. We are of the opinion that evidence of past roof failures was admissible, and although Celotex complains bitterly about the prejudice resulting from the admission of this evidence, it did not request a limiting instruction. Furthermore, in the trial of a civil action in which the claim for relief is based on allegations of fraud, great latitude is ordinarily allowed in the introduction of evidence. *Brakefield v. Shelton,* 76 Kan. 451, Syl. ¶ 3, 92 Pac. 709 (1907).

Evidence relating to events subsequent to the alleged fraudulent act is not per se inadmissible. In *Minx v. Mitchell,* 42 Kan. 688, 692, 22 Pac. 709 (1889), the Kansas Supreme Court stated:

"In cases of this character, where fraud is alleged, it is always permissible to prove every act of the party charged, connected in any way with the subject-matter of the fraud, and sometimes the subsequent action of the party more clearly demonstrates the fraudulent intent than any or all of the circumstances that occurred prior to or at the particular time of the transaction that is alleged to be fraudulent."

The admission of the documentary evidence concerning roof failures occurring after the sale of the Celotex two-ply roof to USD 490 is justified for at least two other reasons. First, the documents were material to the question of Celotex's recklessness in placing its product on the market and touting its virtues. Second, USD 490 sought damages in this case for breach of an express warranty of future performance. As USD 490 states in its brief, such a breach by its very nature would occur subsequent to the date of sale, and it logically follows that proof in this regard must be admissible subject to the trial judge's authority to refuse its admission under circumstances that are not present here.

Although evidence of the type admitted in this case is somewhat prejudicial, we are of the opinion the trial judge did not abuse his discretion in allowing the evidence, especially in light of Celotex's not having seen fit to request limiting instructions, which fact weighs heavily against its claim of prejudice.

Celotex contends the trial court erred in refusing to change venue from Butler County to an adjacent county, basing its contention on the fact that USD 490 is financially supported by

the tax dollars of the residents of Butler County who would have a financial interest in the outcome of the litigation. USD 490 concedes that three of the jurors here resided in the school district, and one of the three had a child enrolled in the school. Apparently the other nine jurors lived outside the boundaries of the school district.

K.S.A. 60-609 provides for a change of venue when "it shall be made to appear that a fair and impartial trial cannot be had in the county where the suit is pending." The allowance or refusal of an application for change of venue rests largely within the discretion of the trial court. *Fredricks v. Foltz,* 221 Kan. 28, 33, 557 P.2d 1252 (1976). One who claims abuse of discretion has the burden of proving that contention and, when reasonable persons could differ as to the propriety of the action taken by the trial court, it cannot be said that the trial court abused its discretion. *McColm v. Stegman,* 3 Kan. App. 2d 416, Syl. ¶ 2, 596 P.2d 167 (1979).

That the potential jurors were from Butler County did not automatically disqualify them to act as jurors. The Kansas Supreme Court has addressed a similar taxpayer-juror qualification issue in *Ridglea, Inc. v. Unified School District,* 206 Kan. 111, 113, 476 P.2d 601 (1970), holding:

"As a practical matter, there is good reason for holding that taxpayers of a taxing unit involved in a lawsuit are not automatically disqualified from serving as jurors. We are told that approximately eighty-five percent of the inhabitants of Saline County reside within the boundaries of Unified School District No. 305. Undoubtedly, there are other areas of Kansas where a school district encompasses all or the major portion of a county. To hold that taxpayers of a school district are absolutely disqualified as jurors in an action against the district would lead to a strange and illogical result, necessitating a change of venue in many instances."

The interest a taxpayer shares with the whole community can generally be regarded as too remote and minute to overbalance his innate sense of justice and fairness to all parties concerned. See *Commonwealth v. Brown,* 147 Mass. 585, 18 N.E. 587 (1888); Annot., 81 A.L.R.2d 708 § 7; 47 Am. Jur. 2d, Jury § 292.

In this case there is no evidence the trial court abused its discretion. Counsel for Celotex examined the jury at length at voir dire concerning any potential for prejudice or bias and passed the jury for cause. We are unable to say the trial judge abused his discretion when he refused to grant a change of venue.

Celotex also complains about the school district's closing argument. It did not object to this allegedly prejudicial comment at

trial and thus the issue will not be considered on appeal. *Smith v. Blakey, Administrator,* 213 Kan. 91, 515 P.2d 1062 (1973).

Celotex argues that the trial court erred by failing to instruct the jury that the school district had a duty to prove the product was defective at the time it left Celotex's control, but in our opinion that does not amount to reversible error. The only theory on which the jury could have awarded punitive damages was fraud. The jury was properly instructed on fraud and must be presumed to have returned its verdict based on fraud. Thus, it was not essential for the jury to have found a breach of implied warranty to return a verdict for the school district. Even if the jury had determined that Celotex breached an implied warranty, such a finding would have amounted to mere surplusage. So even though it appears the jury should have been instructed as requested by Celotex (*Farmers Ins. Co. v. Smith,* 219 Kan. 680, 549 P.2d 1026 [1976]), failure to do so amounts to no more than harmless error. In some circumstances, failure to properly instruct on one theory might taint a verdict sufficiently to amount to reversible error. In this case, however, we see no taint.

Celotex asserts that the trial court erred in refusing to submit to the jury its cross-claim against Sunflower. The cross-claim essentially sought indemnity if Celotex should be found liable to USD 490 for *negligence.* At trial, the court ruled the school district's claim against Celotex for negligence would not be submitted to the jury. The jury's verdict rendered against Celotex in favor of USD 490 was limited to the remaining causes of action in warranty and fraud. Since Celotex could not be found liable for negligence, its cross-claim seeking indemnity from Sunflower in the event it was found guilty of negligence was properly dismissed by the trial court.

It is also argued that the trial court erroneously prohibited Celotex from using a manual on built-up roofing systems in its cross-examination of plaintiff's expert witness. The determination of reliability requisite to admission into evidence of a learned treatise rests in the sound discretion of the trial court. In *Zimmer v. State,* 206 Kan. 304, 309, 477 P.2d 971 (1970), the Kansas Supreme Court stated:

"Mere publication does not *ipso facto* render a work admissible as independent substantive evidence. Such a work becomes admissible when a proper foundation has been laid—establishment of its reliability either by means of judicial notice being taken or the attestation of an expert witness. . . . We hold the deter-

mination of reliability requisite to admission into evidence of learned treatises *rests in the sound discretion of the trial court.*" (Emphasis supplied.)

The school district's expert witness testified at trial that the manual was not necessarily authoritative and was not necessarily well-founded. It also appears from the record that Celotex did cross-examine in the areas in which it wished to use the book. Having reviewed the applicable testimony, the proffers, and the trial judge's reasoning, we are unable to say the trial judge abused his discretion by not allowing the use of the book in the cross-examination of the expert witness.

Celotex also complains that the trial court erred in restricting the examination of several expert witnesses. It first complains that the trial court erred in restricting its examination of its own expert, Ronald Wells, a licensed consulting engineer.

An expert witness must have skill or experience in the matter to which the subject relates. *In re Central Kansas Electric Coop., Inc.,* 224 Kan. 308, 319, 582 P.2d 228 (1978). In considering whether to admit the opinion of an expert witness, the trial court is to consider the education, training, experience and knowledge of the witness. *Nunez v. Wilson,* 211 Kan. 443, 445, 507 P.2d 329 (1973). The qualifications of an expert witness and the admissibility of his testimony are within the sound discretion of the trial judge. *Plains Transp. of Kan., Inc. v. King,* 224 Kan. 17, 21, 578 P.2d 1095 (1978). A trial court has wide discretion in determining whether it will receive opinion evidence. An abuse of discretion must be found in order to reverse the trial court on the admission of expert testimony. *Lindquist v. Ayerst Laboratories, Inc.,* 227 Kan. 308, Syl. ¶ 3, 607 P.2d 1339 (1980).

In our opinion, the trial court did not abuse its discretion when it refused to allow Wells to testify in this case as to his opinion of the cause of the failure of the roof. This case was Wells's first evaluation involving built-up roofing. The first time he had ever heard of two-ply roofing was in June 1978 when he spoke with counsel for Celotex. He testified at trial that he had never been engaged in construction business that related in any way to the field of built-up roofing.

Celotex also complains it was not allowed to cross-examine USD 490's expert witnesses McGraw and Stafford regarding the failure of other roofs, specifically in relation to Sunflower's role in the building of those roofs. While this argument may have some

merit, Celotex fails to show this court precisely where in the 2,000-page record objections were made, and it also fails to show any proffer of the testimonial evidence these witnesses would have provided had they been examined as Celotex intended. We thus decline to find error.

We have examined a number of other arguments by Celotex and find they were not properly preserved for appeal purposes; or they involved questions of fact that the jury had decided adversely to Celotex, and the record contains substantial competent evidence to support the jury's findings. We have considered Celotex's claims of error, both singularly and in conjunction with each other, and do not find reversible error.

The judgment in favor of USD 490 against Celotex for both punitive and actual damages is affirmed. The judgment in favor of USD 490 against Sunflower for actual damages is affirmed. The judgment in favor of Sunflower against Celotex is reversed and remanded with directions to enter judgment for Celotex.

REES, J.: Concurring. I concur in the affirmance of the judgments in favor of U.S.D. 490 and in the reversal of the judgments in favor of Sunflower. However, I have some concern as to possible future reliance upon what is said in the majority opinion.

The essence of the school district's case against Celotex is a products liability claim. As has become all too typical in products liability cases, this case was tried, submitted to the jury and briefed on appeal as one brought on a homogenized theory of recovery; its ingredients are breach of express warranty, breach of implied warranty and fraud. It therefore is without complete surprise that the record and briefs reflect legal analysis and adoption of positions that approach imprecision and inconsistency. The use of general verdict forms has sealed the findings of the jury in darkness.

*Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 602 P.2d 1326 (1979), is cited to us by Celotex for the proposition that punitive damages are recoverable for breach of express warranty in the sale of goods. The majority opinion refers to *Cantrell* as a case similar to this case. It is true that both cases involve an express warranty of performance, evidence that the seller knew of prior failures of the product, and a judgment for punitive damages.

Aside from a claim of misconduct of counsel, there were three issues determined in *Cantrell*. The first was whether there was

evidence to support a finding of breach of express warranty. The Supreme Court held there was an express warranty of performance and evidence it was breached. The second was whether there was evidence to support a finding of reckless disregard of plaintiff's rights. The Supreme Court held there was. The third was whether the punitive damages award was excessive. The Supreme Court held it was not. The *Cantrell* decision goes no farther.

Whether punitive damages are recoverable for breach of an express warranty was not an issue decided in *Cantrell;* the opinion is not authority for the proposition that they are. The opinion of the majority in this case should not be read to hold that they are. A claim for breach of express warranty is in the nature of a contract claim. The rule that punitive damages are not recoverable for breach of contract in the absence of an independent tort as held in *Hess v. Jarboe,* 201 Kan. 705, 443 P.2d 294 (1968), still stands. *Temmen v. Kent-Brown Chev. Co.,* 227 Kan. 45, 51, 605 P.2d 95 (1980). The punitive damages judgment against Celotex results from a claim of fraud, knowing misrepresentation that the strength and durability of the Bond Ply system equalled or exceeded that of the traditional four-ply system, and evidence to support that claim.

Celotex argues it was error to admit evidence of representations made to others and evidence of Bond Ply system failures, all occurring elsewhere and after the sale of the roofing materials in this case. I find Celotex has insufficiently demonstrated that the particular exhibits to which it refers report representations and roof failures occurring after the sale or sales here involved. The particular dates of sale to the plaintiff are uncertain under the evidence; the challenged exhibits are capable of characterization as internal correspondence and reports of Celotex prepared after the sale or sales to plaintiff but in material part concerning prior or contemporaneous representations and roof failures.

Assuming, however, the exhibits constitute evidence of "later" representations and roof failures, there is the question whether such evidence was admissible. The majority opinion seems to say it was. I disagree. If Celotex breached implied or express warranties, they were breached at the time of sale; the challenged evidence is irrelevant as proof of plaintiff's case on those theories. As to fraud, I do not read *Culp v. Bloss,* 203 Kan. 714, 717-718,

457 P.2d 154 (1969); *Frame, Administrator v. Bauman,* 202 Kan. 461, 466, 449 P.2d 525 (1969); *Brakefield v. Shelton,* 76 Kan. 451, 92 Pac. 709 (1907); *Minx v. Mitchell,* 42 Kan. 688, 22 Pac. 709 (1889); and *Hubin v. Shira,* 1 Kan. App. 2d 203, 208-210, 563 P.2d 1079 (1977), to go so far as to approve the admission of evidence of any later fraud or later distinct transactions. In my view, they hold no more than that solely for the purpose of proof of knowledge, intent or state of mind, evidence of earlier or substantially contemporaneous distinct transactions and evidence of later conduct connected with the transaction in issue is admissible.

The majority correctly states that *"[p]unitive damages are imposed* not because of any special merit in the case of the injured party but *to punish the wrongdoer for* malicious, vindictive, or willful and wanton *invasion of the injured party's rights,* the purpose being to restrain and deter others from the commission of like wrongs." (Emphasis added.) Since evidence of later purportedly heinous conduct of Celotex in its dealings with others is unrelated to its claimed invasion of the rights of the school district, evidence of such other occurrences was inadmissible for the purpose of "proving up" punitive damages. Celotex was to be punished in this case for invading the school district's rights, not for invasions of the rights of others. If the exhibits were evidence of later occurrences involving others, they were not admissible as part of an evidentiary foundation for the assessment of punitive damages.

I am unable to approve the admission into evidence of the challenged exhibits as the majority apparently does. In my limited research I have failed to find Kansas or other authority applicable to this case that authorizes the admission of such "later" evidence beyond the bounds I have described. Treating the exhibits as "later" evidence, I do not view them as admissible proof of "recklessness" vis-a-vis this plaintiff and I find them irrelevant evidence as to breach of warranty of performance as to this plaintiff.

Although I believe that if the exhibits were truly evidence of later events their admission into evidence was improper, plaintiff's failure on appeal to affirmatively establish error in their admission precludes our finding of prejudicial error.