MR. JUSTICE MORRISON
dissents as follows:
I very vigorously dissent from that aspect of the majority opinion relating to Goodyear’s political activities. The serious departure from evidentiary standards found in the majority position results from an emotional reaction to “Watergate”. From time to time the judicial vision of even appellate judges becomes clouded. Sadly, this is one of those times.
Let us forget about political partisanship. Let us not debate the morality of the Nixon administration. This is a court of law. Well recognized evidentiary principles exist and properly applied, they control the resolution of this issue.
The applicable legal principles are:
1. In civil actions, a trial court has wide discretion in admitting circumstantial evidence and its ruling will not be disturbed on appeal absent a showing of abuse of discretion. Unified School District #490, Buttler [Butler] County v. Celotex Corp. (1981), 6 Kan. App.2d 346, 629 P.2d 196; Barmeyer v. Montana Power Co. (1983), 202 Mont. 185, 657 P.2d 594, 40 St.Rep. 23.
2. Circumstantial evidence sufficient to prove a fact in a *66 civil cause need not exclude every reasonable conclusion other than the conclusion sought to be established. Plaintiff’s evidence is sufficient if it affords a basis for a reasonable inference by the trier of fact although there are other reasonable inferences which might be drawn by that trier of fact. Jacques v. Montana National Guard (1982), 199 Mont. 493, 649 P.2d 1319, 39 St.Rep. 1565.
3. Fraudulent, dishonest and dishonorable conduct cannot often be proven hy direct evidence. Therefore, the courts grant great latitude to the one having the burden of proof. Facts which throw suspicion on a transaction or course of dealing are admissible even though a certain amount of speculation is necessarily involved when drawing inferences from those facts. Montana National Bank v. Michels (1981). 631 P.2d 1260, 38 St.Rep. 334; Merchants National Bank v. Greenhood (1895), 16 Mont. 395, 41 P. 250.
The evidence which the majority found to be improperly admitted, and which will be excluded from the future trial, can be summarized as follows:
In April of 1970, the National Highway Traffic Safety Administration had instituted an investigation of K-rims. The stated purpose of the investigation was to determine whether the problemrepresenteda safety defect within the meaning of the National Traffic and Motor Vehicle Safety Act of 1966 (tr. 1894). The investigation was known as OBI-215. The investigation was officially closed on December 31, 1973, without a consumer notification or recall campaign (plaintiff’s exhibit 37, tr. 1893 and 1899).
There is no question that Goodyear was seriously concerned about the investigation and the potential of having to notify consumers that K-rims were dangerously defective. There were 2,900,000 K-type rims in service in 1972-73 (tr. 3181). Joseph Hutchison, the head of safety for Goodyear, estimated the cost of replacing K-rims at $50 apiece (tr. 1712). The cost of a recall would reach the magnitude of $145,000,000. Hutchison, the head of safety, characterized the investigation of K-rims as an “overwhelming problem” *67 (plaintiffs exhibit 72). A Goodyear engineer researching the problem, was told by the Department of Transportation that the investigation had “top priority” (tr. 3735-36).
The person who, prior to March of 1972, had headed the office of defects investigation for NHTSA was one Joseph Clark. In February and March of 1972, Goodyear executives had negotiated a cash contribution to the Committee for Re-election of the President. Initially, Goodyear offered $20,000. Maurice Stans rejected this offer and said he hoped for $50,000. Thereafter, a Goodyear vice president named Arden Firestone carried cash and checks totaling approximately $45,000 to the Committee to Re-elect. This was done March 14, 1972. Three days later, on March 17, 1972, Carter was removed from his position and transferred to Ohio. He was replaced by Andrew Detrick, who was placed in charge of the office of defects investigation though he had no background in that kind of work.
In early August, 1972, Joseph Hutchison met in Washington with Andrew Detrick to lobby him regarding the K-rim investigation. After Hutchison’s first meeting with Detrick, he wrote a letter summarizing his meeting as follows:
“Detrick stated that he feels a safety problem exists on these multi-piece truck rims, and that he would like to handle this problem before it gets any more publicity.”
In the months that followed, Goodyear executives lobbied Detrick against requiring a manufacturer’s notification campaign. Investigation 215 was officially closed on December 31, 1973, without requiring consumer notification. The closing of investigation 215 resulted from a recommendation by Andrew Detrick. Detrick briefed the administrator of the National Highway Traffic Safety Administration and the job was accomplished.
The facts here are very simple. The decision to move Detrick in as head of product defects investigation was made by the Nixon administration. It was a political decision pure and simple. The move occurred several days after a $45,000 contribution was made to the campaign. To say *68 that this evidence cannot be considered by a jury because, as a matter of law, there is no connection between the contribution and the personnel change is to totally fail in recognize the realities of the political process.
All of the activities of Goodyear in attempting to influence government action are admissible for one or more of the following reasons:
(1) The evidence shows that Goodyear had knowledge of the defect.
(2) The evidence shows that Goodyear was not taking steps to notify the public of the known defect, but in fact was attempting to scuttle any notification.
(3) The evidence tends to prove fraud, malice, or oppression, which form the basis for an award of punitive damages.
In Kuiper v. District Court (1981), 632 P.2d 694, 38 St.Rep. 1288, we said:
“That investigation was commenced in 1970 for the purpose of determining why K-type truck rims seemed to cause numerous accidents. The relator seeks to establish that Goodyear attempted, through influence, to terminate the investigation. The relator alleqes that Goodyear ‘covered up’ the defect in a product, which Goodyear knew to be unsafe, and that the relator is entitled to prove such facts to establish a basis for punitive damages.” 632 P.2d at p. 696, 38 St.Rep. at p. 1289.
And,
“Relator’s deposition questions are designed to prove Goodyear knew it had a defective product and attempted to prevent public knowledge of that defect. Such facts would tend to prove malice and are relevant to the issues pleaded.” (Emphasis added.) 632 P.2d at p. 703, 38 St.Rep. at p. 1298.
Likewise, the District Court held this evidence to be admissible and in the order denying Goodyear’s motion for a new trial, on pages 15 and 16 of the order, said:
“In these circumstances Goodyear’s motions in limine *69 must be denied in that the facts established a submissible jury issue on the basis that the slush fund payments were evidence of an attempt to abort the spirited investigation at the NHTSA as proof of defect in the product. In the Matter of the National Deposition of James D. Rhoades (sic), Archivist of the United States, Miscellaneous No. 79-0216, United States District Court for the District of Columbia, October 1, 1980. Such evidence was also admissible on the issue of malice. Kuiper v. District Court, Mont., 632 P.2d 694 (Mont.1981).”
Dishonest conduct can seldom be proven with direct evidence. The difficulties of the task are eloquently described by Justice De Witt in Merchants’ National Bank v. Green-hood, supra, wherein he said:
“Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know ‘whence it cometh and whither it goeth.’ It ‘loves darkness rather than light, because its deeds are evil.’ It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon on its sinuous course. When we so discover it, the search light of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances individually trivial . . . but in their mass ‘confirmation strong as proofs of holy writ.’ The weight of isolated items tending to drifting snow,’ but the drifting snow in time makes the drift, the avalanche, the glacier. Fraud may hang over the history of the acts of a man like the leaden-hued atmosphere upon the house of Usher, ‘faintly discernible but pestilent, an atmosphere which has no affinity with the air of Heaven.’ ” 16 Mont, at p. 429, 41 P. at p. 259.
Justice De Witt, in concluding remarks, stated the scope of judicial review which should have guided the delibera *70 tions of this Court.
“Under this atmospheric pressure of fraud the jury in this case lived and breathed for the 21 days of the trial. We have followed them through the history of those days, as it is transmitted to this court in the record. We have not the advantage of breathing and seeing and hearing which they had. The district court had that advantage, and agreed with the findings of the jury. We are of opinion that, under these circumstances, the evidence is not so insufficient that we .should disturb the result.” 16 Mont, at pp. 429430, 41 P. at p. 259.
The majority places evidence upon the fact that the trial court found that evidence of Goodyear’s attempts to suppress knowledge of the dangerous propensities of its split-rim and its efforts to scuttle the investigation would be prejudicial to the defendant. Of course such evidence would be prejudicial. The purpose of offering the evidence is to expose the fraud and punish the defendant. The question is not just whether the evidence is prejudicial, but rather whether our rules of evidence permit consideration of the evidence. The evidence here introduced was not only relevant and probative but was essential to prove a course of conduct that plaintiff seeks to punish.
If I understand the majority opinion correctly, no certain piece of testimony or document is found to be irrelevant, thereby justifying a new trial. Rather, any evidence which falls under the umbrella designated “Watergate” is to be suppressed. Like Rosemary’s tapes, this evidence of wrongdoing is erased from public scrutiny and forever shielded from jury censory.
The majority states: “We regret that counsel deemed it necessary to bring in this totally extraneous and prejudicial material. It prevented his seriously-injured client, as well as the defendant, from receiving a fair trial.” In my judgment trial counsel would have been remiss not to have presented the evidence of bribery. The failure is not counsel’s. The fault lies here.
*71 As with most dissents, my cry may neither be heard nor felt. At least my conscience is clear.