(232 P.3d 866)
No. 102,669

MICHAEL PAUL WIEHE, *Appellee*, v. KISSICK CONSTRUCTION COMPANY and BUILDERS MUTUAL CASUALTY CO., *Appellants*.

Opinion filed May 6, 2010.

C. *Anderson Russell*, of Kansas City, Missouri, for appellants.

*Christopher J. McCurdy*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, for appellee.

Before LEBEN, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Kissick Construction Company (Kissick) and its insurance company, Builders Mutual Casualty Co. (collectively appellants), appeal from a decision by the Workers Compensation Board (Board) to award Michael Wiehe workers compensation benefits. While working for Kissick, Wiehe was injured when the machine he was operating tipped over and he was ejected from the machine. Shortly after the accident, Wiehe underwent drug testing, which revealed a level of marijuana that demonstrated a conclusive presumption of impairment under K.S.A. 2009 Supp. 44-501(d)(2). The Board determined, however, that the impairment exception under K.S.A. 2009 Supp. 44-501(d)(2) did not apply to relieve Kissick of liability for workers compensation benefits because there was not sufficient evidence to show that Wiehe had behaved "erratically" or "unusually" before the accident.

Nevertheless, we determine that the Board erroneously interpreted and applied K.S.A. 2009 Supp. 44-501(d)(2) to impose a highly inflated, and seemingly insurmountable, burden of proof on the employer. Here, the evidence produced by Kissick established a conclusive presumption of Wiehe's impairment under K.S.A. 2009 Supp. 44-501(d)(2) and also showed that Wiehe's injuries had been contributed to by his impairment, which resulted in him operating the machine in a manner that demonstrated extremely poor judgment. Under those circumstances, we find that Kissick met its burden to establish that Wiehe's injuries were contributed to by his use of drugs and that the impairment exception under K.S.A. 2009 Supp. 44-501(d)(2) relieves Kissick of liability for workers compensation benefits. Accordingly, we reverse the Board's decision awarding Wiehe workers compensation benefits.

The accident in question in this case occurred on September 21, 2005, while Wiehe was working for Kissick on a highway-widening

project in Gardner. Wiehe was operating a sheep's foot roller, which leveled and compacted dirt so that asphalt could be laid on top. Wiehe, who was an operating engineer affiliated with the local construction union, had been hired by Kissick for this particular project the week before the accident occurred.

Wiehe testified that he had operated a sheep's foot roller approximately 100 times previously and that the particular roller he was operating for Kissick did not have as much power as the other rollers he had operated. Moreover, the sheep's foot roller he was operating had rubber tires, instead of the heavier steel wheels that were on other sheep's foot rollers.

When the accident occurred, Wiehe was attempting to break apart a large mass of dirt that had recently been dropped in the area. Wiehe testified that he drove forward over the pile of dirt with the sheep's foot roller and attempted to level the pile with the blade on the front of the machine. According to Wiehe, he then attempted to back over the pile to again try to level it, but the sheep's foot roller tipped over and ejected him from the machine onto the pavement. The sheep's foot roller had a seat belt, but Wiehe was not wearing it when the accident occurred.

Brad Lawson, who worked for Kissick, had been standing near Wiehe and the sheep's foot roller when the accident occurred. According to Lawson, he watched Wiehe attempt to back over the mass of dirt twice. Lawson testified that as he watched Wiehe back the sheep's foot roller towards the mass of dirt the first time, Lawson thought the mass was too large for the machine. Upon hitting the mass, the sheep's foot roller went high center and stopped. Lawson testified that as Wiehe drove the sheep's foot roller forward off the large mass, Lawson was relieved that the machine had not flipped.

Lawson testified that the machine was not equipped to be utilized in that manner and "[y]ou almost never see sheep's foot operators contact dirt with the rear of their machine first." According to Lawson, the dirt did not have to be spread out at that point. Lawson testified that more loads of dirt were going to be dropped in the area, and the blade hand would have come over to spread the dirt out before it was compacted.

Lawson then saw Wiehe move the machine over so that its right tire was in line with the large mass of dirt and begin to back up again. Lawson testified that he was "pretty much just freaked out" and shook his head to communicate to Wiehe to "just forget it, don't try to do it" because he was afraid that the machine was going to tip over. When the sheep's foot roller hit the mass of dirt the second time, the mass did not break apart sufficiently, and the machine tipped over.

As a result of the accident, Wiehe suffered numerous injuries, including severe pelvic injuries, and was hospitalized. Consistent with Kissick's postaccident drug and alcohol policy, a drug test was performed on Wiehe at the hospital. The drug test results revealed that Wiehe had a level of marijuana of 62 ng/ml, which was more than four times the level to establish a conclusive presumption of impairment under 44-501(d)(2). Although preliminary testing of Wiehe's urine sample indicated a presence of methamphetamine, the final test results did not demonstrate the presence of methamphetamine.

Wiehe admitted that he had used both methamphetamine and marijuana the day before the accident. Wiehe testified that when he got off work on September 20, 2005, he took two hits of methamphetamine and also shared a marijuana joint at the job site with another worker. Wiehe further testified that after going home that evening, he smoked another marijuana joint around 8 p.m. Wiehe testified that he was a regular user of marijuana around the time the accident occurred. According to Wiehe, he went to bed around 9 p.m. that evening and then woke up around 5 a.m. the next morning to get ready for work. Wiehe testified that he was clearheaded and not on drugs the day of the accident.

Based on the injuries he suffered during the accident, Wiehe filed for workers compensation benefits against the appellants. At a January 2006 preliminary hearing before the ALJ, the appellants argued that Wiehe's injuries were contributed to by his drug impairment, and therefore he was not entitled to workers compensation benefits under 44-501(d)(2).

In addition to Lawson's and Wiehe's testimony, the ALJ also heard testimony from Michael Eddings, the pipe foreman for Kis-

sick. Just before the accident, Eddings had come to the job site to deliver an item. Eddings testified that as he was driving slowly by the area where the sheep's foot roller was being used, he noticed that the operator (Wiehe) was acting "a little goofy or squirrely." According to Eddings, he was driving about 3 to 4 miles per hour and was about 4 feet away from Wiehe when he passed him. Eddings testified that Wiehe was bobbing and weaving his head, and Eddings thought there might be a problem with him. Eddings further testified that he had attempted to talk to Jack Staton, the site supervisor, about Wiehe but Staton was too busy to talk with him before the accident occurred. According to Eddings, he was finally able to voice his concerns to Staton later in the afternoon after the accident had occurred. It was not until 8 days after the accident that Eddings made a written statement about his concerns.

Consistent with Eddings' testimony, Staton testified that Eddings had talked to him about Wiehe after the accident had occurred. According to Staton, Eddings told him that Wiehe had been "all over that machine" and had been acting like "a wild squirrel or something that just wasn't comprehending everything." Staton testified that he later asked Eddings to write a voluntary statement on what he had observed.

According to Staton, the sheep's foot roller operated by Wiehe had not been equipped to spread the dirt. Staton testified that Wiehe should have continued going over the dirt that had already been leveled and compacted until the larger machine came over to break apart the mass of dirt. Moreover, Staton testified that there was adequate room for Wiehe to turn the machine around if he wanted to try to knock down the mass of dirt with his blade.

Wiehe, however, testified that although the machine turns in the middle, there was not enough room for him to turn the machine around. According to Wiehe, Staton had told him earlier that day to keep moving, and Wiehe was afraid of losing his job if he did not keep moving.

In a January 2006 written order, the ALJ denied Wiehe's request for workers compensation benefits. In doing so, the ALJ discredited Staton's testimony and also determined that Lawson was in a better position to observe Wiehe than Eddings was. The ALJ found

that although Lawson did not observe any behavior like that claimed by Eddings, Wiehe was impaired by drugs under 44-501(d)(2) when the accident occurred. The ALJ then found that Kissick had proved by a preponderance of the evidence that Wiehe had been impaired by drugs when the accident occurred and that Wiehe's use of drugs contributed to his injuries.

Nevertheless, the Board member reviewing the ALJ's decision determined that without evidence to explain the effect of the drugs on Wiehe, the link between Wiehe's accident and his conclusive impairment status had not been established under 44-501(d)(2). Therefore, the Board reversed the ALJ's order denying Wiehe workers compensation benefits under 44-501(d)(2).

At an April 2006 preliminary hearing, Kissick presented testimony from Robert Matter, an experienced operating engineer working for the local operating engineers' union. Matter also managed the union's apprenticeship training program, for which he provided written tests and also hands-on equipment training. Matter testified that Wiehe's action of attempting to run over a mass of dirt showed an extreme lack of judgment for an experienced operator. According to Matter, "[a]ttempting to run over a hump almost always results in a tip-over with this small a compactor and is never necessary." Matter testified that when Wiehe failed to get over the mass of dirt the first time, this should have raised awareness of a potential problem if he tried it again. Matter testified that there was nothing to account for the accident other than Wiehe's marijuana impairment. Matter further testified that the sheep's foot roller had a roll-over protective structure, and Wiehe would not have been injured had he been wearing his seatbelt and remained inside the cab of the machine.

Kissick also presented testimony from Charles Foshee, an addiction counselor, who said that the circumstances surrounding Wiehe's accident showed that drug impairment played a role in the accident. Foshee testified that people who have high levels of marijuana have impaired judgment and impaired logic. Foshee explained that although a lot of people who used marijuana on a long-term basis are able to function normally, they will have a slower motor affect and will be avoidant, will be very tunnel visioned, and

will not be cognizant of things around them. Foshee indicated that it is much harder to identify someone who is impaired by marijuana as opposed to someone who is impaired by alcohol. According to Foshee, Wiehe's decision to back over the pile, knowing that the sheep's foot roller was more tipsy than others he had operated, was an impaired decision.

In an April 2006 written order, the ALJ found that the case was in the same factual posture as it had been at the January 2006 hearing. The ALJ determined that the evidence produced by Kissick failed to show how Wiehe's impairment contributed to the accident. The ALJ pointed out that the record did not demonstrate what physical or mental effects of marijuana played a factor in the occurrence of the accident.

Nevertheless, the ALJ determined that the safety device defense under 44-501(d)(1) precluded Wiehe from receiving workers compensation benefits. The Board, however, reversed the ALJ's order denying Wiehe workers compensation benefits and determined that Wiehe's failure to use a safety belt did not meet the safety device defense under 44-501(d)(1).

Next, at an October 2006 preliminary hearing, Kissick presented evidence from toxicologist Daniel Brown, Ph.D. According to Brown, based on his training and experience as a toxicologist and on the enormous body of scientific literature on the subject, marijuana causes some degree of residual impairment for 24 hours after consumption. Brown listed a number of ways that marijuana can cause impairment, including muscular incoordination, impaired balance, delayed reaction time, impaired visual function, sedation, memory dysfunction, and impaired judgment in terms of both risk assessment and temporal and spatial relationships. Brown testified that when a person regularly uses marijuana, more and more of the drug remains in the body in relatively significant concentrations that produce long-term effects. According to Brown, heavy or chronic marijuana users can demonstrate changes in performance and cognitive abilities that persist for weeks or even months.

In explaining how marijuana would affect the situation present in this case, Brown testified that one's ability to assess the safety

of the situation, the speed of the machine, the distance from the mass of dirt, and the tilt of the machine would be impaired. Brown attributed several factors involved in the accident to Wiehe's marijuana impairment, including the decision to attempt to back his machine over the mass of dirt, not responding to Lawson's warnings, and failing to wear his seat belt. After reviewing the facts surrounding the accident, Brown's opinion was that Wiehe's impairment was the proximate cause of his injuries.

Wiehe offered a report and deposition testimony from Curtis Klaassen, a toxicologist at the University of Kansas Medical Center. Klaassen's opinion was that Wiehe's use of marijuana did not contribute to his accident. In explaining his opinion, Klaassen testified that marijuana's effects last for only a few hours, and that Wiehe had smoked the marijuana approximately 15½ hours before his accident.

In an October 2006 written order, the ALJ determined that Kissick had proved by a preponderance of the evidence that Wiehe's impairment from marijuana contributed to the September 2005 accident and his resulting injuries. As a result, the ALJ concluded that Kissick was not liable for workers compensation benefits under 44-501(d)(2).

The Board reversed the ALJ's order. In determining that Kissick was responsible for workers compensation benefits, the Board member reviewing the ALJ's order stated that "[t]he time between the ingestion of the marijuana and the accident, the dispute between the experts as to the lasting effects of marijuana, coupled with the fact that even if you assume that claimant was impaired and accept Dr. Brown's view" was insufficient to find that Wiehe's impairment contributed to his accident.

In January 2009, the ALJ found that Wiehe had a 28% impairment to the body as a whole and issued an award for permanent partial disability benefits, for past temporary total disability payments, and for authorized medical expenses. Two members of the Board affirmed the ALJ's award. One Board member dissented from the Board's order and determined that the facts of this case met the impairment exception under 44-501(d)(2) and, therefore, Kissick should be relieved from liability.

On appeal, the issue before this court is whether the Board erred in determining that Kissick failed to prove that Wiehe's injuries were contributed to by his impairment under K.S.A. 2009 Supp. 44-501(d)(2). This issue requires interpretation of K.S.A. 2009 Supp. 44-501(d)(2) and review of the ALJ's and the Board's findings as applied to K.S.A. 2009 Supp. 44-501(d)(2).

## STANDARD OF REVIEW

Statutory Interpretation

Under K.S.A. 2009 Supp. 44-556(a), the Board's decisions are reviewed under the Kansas Judicial Review Act (KJRA), K.S.A. 2009 Supp. 77-601 *et seq.*, which applies generally to appeals from administrative agencies. *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 361-62, 212 P.3d 239 (2009). To the extent that Kissick's argument relates to the Board's interpretation and application of K.S.A. 2009 Supp. 44-501(d)(2), this court shall grant relief only if it determines that "the agency has erroneously interpreted or applied the law." See K.S.A. 2009 Supp. 77-621(c)(4).

The interpretation of statutory provisions under the Workers Compensation Act, K.S.A. 44-501 *et seq.*, is a question of law. For many years, our Supreme Court has said that the Board's interpretation of workers compensation statutes, although not binding on the courts, was " 'entitled to judicial deference if there is a rational basis for the Board's interpretation.' *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 521, 154 P.3d 494 (2007). [Citations omitted.]" *Barbury v. Duckwall Alco Stores*, 42 Kan. App. 2d 693, 695, 215 P.3d 643 (2009). Recently, however, our Supreme Court has stated that "[n]o significant deference is due the ALJ's or the Board's interpretation or construction of a statute. [Citations omitted.]" *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 361, 204 P.3d 1156 (2009).

*Questions of Fact*

Under K.S.A. 2009 Supp. 77-621(c)(7) of the KJRA, an appellate court reviews questions of fact, in light of the record as a whole, to determine whether an agency's findings are supported to the

appropriate standard of proof by substantial evidence. An appellate court shall grant relief if its determines that "the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2009 Supp. 77-621(c)(7).

K.S.A. 2009 Supp. 77-621(d) further defines an appellate court's task in reviewing questions of fact "in light of the record as a whole," as follows:

" '[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, complied pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

Thus, K.S.A. 2009 Supp. 77-621(d) defines "in light of the record as a whole" to include the evidence both supporting and detracting from an agency's finding. Moreover, under K.S.A. 2009 Supp. 77-621(d), this court must consider the credibility determination that the hearing officer "who personally observed the demeanor of the witness" made. If the agency head, here the Board, does not agree with those credibility determinations, the agency should give its reasons for disagreeing. This court must consider the agency's explanation as to why the relevant evidence in the record supports its material factual findings. For this court to fairly consider an agency's position should it disagree with a hearing officer's credibility determination, an explanation of the agency's differing opinion is generally needed. Although the statute does not define the term substantial evidence, case law has long stated that it is such evidence as a reasonable person might accept as being sufficient to support a conclusion. *Herrera-Gallegos*, 42 Kan. App. 2d at 362-63.

Further explaining how the "in light of the record as a whole" standard is to be applied, Judge Leben in *Herrera-Gallegos* states as follows:

"The amended statute [K.S.A. 2009 Supp. 77-621] finally reminds us that we do not reweigh the evidence or engage in de novo review, in which we would give no deference to the administrative agency's factual findings. Indeed, the administrative process is set up to allow an agency and its officials to gain expertise in a particular field, thus allowing the application of that expertise in the fact-finding process. But we must now consider all of the evidenceincluding evidence that detracts from an agency's factual findingswhen we assess whether the evidence is substantial enough to support those findings. Thus, the appellate court now must determine whether the evidence supporting the agency's decision has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion." 42 Kan. App. 2d at 363.

With these standards firmly in mind, we turn now to addressing the merits of Kissick's argument.

*Interpretation of K.S.A. 2009 Supp. 44-501(d)(2)*

K.S.A. 2009 Supp. 44-501(d)(2), which has become known as the "impairment defense" or "impairment exception" for an employer in a workers compensation case, provides as follows:

"The employer shall not be liable under the workers compensation act where the injury, disability or death was contributed to by the employee's use or consumption of alcohol or any drugs, chemical or any other compounds or substances . . . . It shall be conclusively presumed that the employee was impaired due to alcohol or drugs if it is shown that at the time of the injury that the employee had . . . a GCMS confirmatory test by quantitative analysis showing a concentration at or above the levels shown on the following chart for the drugs of abuse listed: . . . Marijuana metabolite . . . 15 [ng/ml]."

Thus, K.S.A. 2009 Supp. 44-501(d)(2) provides the employer relief from liability for workers compensation benefits "where the injury, disability, or death was contributed to by the employee's use or consumption of alcohol or any drugs, chemicals, or any other compounds or substances."

Although an employer has the burden of proving the impairment defense under K.S.A. 2009 Supp. 44-501(d)(2) to relieve itself from liability for workers compensation, our Supreme Court has pointed out that the legislature history of 44-501 reflects a trend of lessening the burden upon the employer to establish the impairment exception. *Foos v. Terminix*, 277 Kan. 687, 693, 89 P.3d 546 (2004). Our Supreme Court in *Foos* explained as follows:

"The Kansas Legislature passed its first workers compensation laws in 1911. From the very beginning, the employee's intoxication was a defense to his or her claim of compensation. '[I]f it is proved that the injury to the workman *results . . . from his intoxication*, any compensation in respect to that injury shall be disallowed.' (Emphasis added.) L. 1911, ch. 218, sec. 1.

"In 1967, the legislature raised the employer's standard of proof: '[I]f it is proved that the injury to the workman results *. . . solely* from his intoxication, any compensation in respect to that injury shall be disallowed.' (Emphasis added.) L. 1967, ch. 280, sec. 1.

"In 1974, however, the legislature retreated and diluted the employer's standard of proof when it changed the word 'solely' to 'substantially': '[I]f it is proved that the injury to the workman results *. . . substantially* from his intoxication, any compensation in respect to that injury shall be disallowed. . . .' (Emphasis added.) L. 1974, ch. 203, sec. 1.

"In 1993, the legislature further diluted the employer's standard of proof: 'The employer shall not be liable under the workers compensation act where the injury, disability or death was *contributed to by the employee's use or consumption of alcohol . . . .*' (Emphasis added.) L. 1993, ch. 286, sec. 24." 277 Kan. at 697-98.

Not only has the legislature diluted the employer's burden of proof under K.S.A. 2009 Supp. 44-501(d)(2) by requiring merely that "the injury, disability, or death *was contributed to* by the employee's use or consumption" (emphasis added), L. 1993, ch. 286, sec. 24, of alcohol or drugs, but it has also established a conclusive presumption of impairment if certain quantitative alcohol or drug levels are shown from an employee's chemical test.

A conclusive presumption, which is also called an absolute presumption or an irrebuttable presumption, is "[a] presumption that cannot be overcome by any additional evidence or argument." Black's Law Dictionary 1305 (9th ed. 2009). As explained in Eggleston, Evidence, Proof and Probability, p. 106 (2d ed. 1983):

"Conclusive presumptions, sometimes called irrebuttable presumptions of law, are really rules of law. Thus it is said that a child under the age of 14 years is conclusively presumed to be incapable of committing rape. . . . [This] is only another way of saying that such a child cannot be found guilty of rape."

Thus, a conclusive or irrebuttable presumption is not a presumption at all; it is a substantive rule of law directing that proof of certain basic facts conclusively provides an additional fact which cannot be rebutted. 29 Am. Jur. 2d, Evidence § 201.

By including the conclusive presumption of impairment in K.S.A. 2009 Supp. 44-501(d)(2), the legislature has created a substantive rule of law that an employee who tests at or above the established quantitative level for alcohol or drugs, subject to the other requirements under 44-501(d)(2), is impaired. Once it has been established that the employee was impaired under 44-501(d)(2), no additional evidence or argument can overcome that fact.

The legislature's decision to include this conclusive presumption of impairment in K.S.A. 2009 Supp. 44-501(d)(2) is highly significant. Impairment is defined as "[t]he fact or state of being damaged, weakened, or diminished." Black's Law Dictionary 819 (9th ed. 2009); see also Webster's II New College Dictionary 553 (2001) (Impair means to "decrease in strength, value, amount, or quality."). Thus, when a person is impaired, it follows logically that the person's mental and physical faculties are damaged or diminished.

While a conclusive presumption of impairment does not eliminate the employer's burden to show that an employee's injury, disability, or death *was contributed to by the employee's use or consumption of alcohol or any drugs*, chemicals, or any other compounds or substances under K.S.A. 2009 Supp. 44-501(d)(2), it does allow the employer to surmount a hurdle to meet the impairment exception under 44-501(d)(2). To illustrate, which situation would require a greater showing that an employee's injury was contributed to by the employee's drug or alcohol use: (1) An employee who, shortly after the accident, has a measured level of alcohol or drugs in the employee's system that conclusively establishes impairment or (2) an employee who has previously consumed drugs or alcohol but there is no evidence to show that the employee was conclusively impaired? The answer is obvious. Generally, the employer would need to make a greater showing that the injury was contributed to by the drug or alcohol use of an employee who was not conclusively impaired.

*Application of K.S.A. 2009 Supp. 44-501(d)(2) to the Present Case*

It is undisputed in this case that the conclusive presumption of impairment under K.S.A. 2009 Supp. 44-501(d)(2) applied to

Wiehe. Wiehe's test result, which was taken shortly after the accident, showed more than four times the quantitative level of marijuana for impairment established in K.S.A. 2009 Supp. 44-501(d)(2).

As a result, the only question remaining under K.S.A. 2009 Supp. 44-501(d)(2) is whether Kissick met its burden to show that Wiehe's injury or disability was contributed to by Wiehe's use of drugs.

*Board's Improper Application of K.S.A. 2009 Supp. 44-501(d)(2)*

In determining that Kissick had failed to meet its burden under 2009 Supp. K.S.A. 44-501(d)(2), the Board stated as follows:

"To be clear, claimant's decision to consume illegal substances on the evening before his accident demonstrates a considerable lack of judgment. But based on the evidence contained within this record, there is little if any credible evidence that claimant's presumptive impairment contributed to his accident. He drove to work, apparently without incident. He began his work day at approximately 7:15 a.m. He worked continuously for four hours until the time of the accident. He was told to keep his machine moving which he did. One coworker points to his unusual approach to the spreading of this dirt pile, but the pictures reveal a significant pile of dirt with one large clod of dirt. It is not surprising that the machine claimant was operating, which both parties agree is unstable, would tip over as he was trying [to] smooth the area out.

"As was noted early on in this claim, claimant may have exhibited poor judgment in his method of operating the machine. But if claimant was so impaired as Dr. Brown suggests, one would expect at least one of his coworkers to say or do something to prevent him from continuing on with his job on that day long before he tipped the equipment over and was injured. Instead, all we are left with is an allegation that one coworker made eye contact with him at the moment of the accident and gestured in a manner telling him 'no' and another coworker who alleges, after driving by him, that claimant was acting squirrely[*sic*]. And the last of respondent's witnesses was found to be less than straightforward with his testimony. Thus, none of these were persuasive on the issue of claimant's impairment or his ability—or inability—to perform his job duties on the day of his accident."

The Board's decision revolves around its determination that there was no credible evidence that Wiehe was acting erratically or unusually on the morning of the accident. From this negative evidence, the Board drew a conclusion that Wiehe's presumptive impairment did not cause or contribute to the accident. The logic

of that conclusion is based upon a syllogism, which is essentially as follows:

> No employee's presumptive impairment will contribute to the employee's accident when no evidence exists that the employee was "acting erratically or unusually" before the accident occurred.
>
> Although employee A was presumptively impaired when the accident occurred, no evidence exists that employee A was "acting erratically or unusually" before the accident happened.
>
> Therefore, employee A's presumptive impairment did not contribute to the accident.

The Board's logic is flawed for it would compel the conclusion that whenever an employee showed no signs of erratic or unusual behavior before the accident occurred, the employee's presumptive impairment would not have caused or contributed to the employee's accident. Nevertheless, just because an employee does not display any erratic or unusual behavior does not mean that the employee's presumptive impairment would not have caused or contributed to the accident.

Moreover, the Board's reasoning is an example of what logicians describe as the "Fallacy of Exclusive Premises." Copi and Cohen, Introduction to Logic, p. 239 (12th ed. 2005). From two negative premises no conclusion can be drawn. The reason is that we cannot argue about the relation between two classes from the mere fact that they are both excluded, wholly or in part, from a third class. In our case, the third class is the following: No evidence exists that the employee was "acting erratically or unusually" before the accident occurred. When each premise contains an exclusion, the argument is not a syllogism; that is, its premises do not jointly imply the conclusion, as is in this case.

For example, "No native-born Sooners are persons born in Kansas" and "No native-born Hoosiers are persons born in Kansas" furnishes no basis for inferring any connection whatsoever between the native-born Sooners and the native-born Hoosiers. To attempt to draw an inference from such a connection is to commit the fallacy of exclusive premises.

Although not required by K.S.A. 2009 Supp. 44-501(d)(2), Kissick presented evidence to the ALJ and the Board to demonstrate that a person whose judgment and decision-making skills are impaired by marijuana would not display the typical overt signs of impairment. Specifically, Kissick presented evidence from addiction counselor Foshee, who testified that other people would have a difficult time identifying someone who was impaired by marijuana versus someone who was impaired by alcohol or a benzodiazepine, which is a tranquilizer. According to Foshee, people who are alcohol impaired display a lot of obvious external symptoms, including the odor of alcohol and effects on their motor skills. On the other hand, Foshee testified that people who engage in long-term marijuana use "are able to function very normally" and would be "more avoidant, surface level, slow to respond." Although red eyes are often a symptom of marijuana use, Foshee testified that marijuana users have found ways to conceal that symptom.

Toxicologist Brown further explained how a person who is impaired by marijuana would function normally until something unexpected is placed in his or her path:

"When a person is under the influence of drugs, the vast majority of the time they get home safely, put their car in the garage, and go to bed and go to sleep.

"It's when unexpected or unusual events occur—like a kid running out from between parked cars or a garbage truck pulling out of an alley or a deer crossing the road, that something you didn't expect occurs and you have to react and your reactions aren't appropriate any longer because of the influence of the drug.

"This is a typical case where that Mr. Wiehe might have carried out his job just fine if that lump of clay hadn't been placed there. But once this unexpected event occurred, that's when you get into trouble.

. . . .

"You need to react to a situation to prevent injury, and your ability to react is impaired. And under those circumstances there's a high degree of probability there's going to be an injury."

Although Kissick presented expert testimony as to why Wiehe's coworkers would not have noticed observable signs of Wiehe's impairment on the morning of the accident, the Board invented a vague erratic or unusual standard, which required Kissick to produce credible evidence that Wiehe had acted erratically or unusually on the morning of the accident. Such a standard is not im-

posed by the plain language of K.S.A. 2009 Supp. 44-501(d)(2) and would have to be read into the statute to reach the Board's conclusion here. As an appellate court, we do not read into the statute something that is not readily found in it, and we do not add words that are not present in the statute. *In re E.R.*, 40 Kan. App. 2d 986, 987, 197 P.3d 870 (2008).

Moreover, what would constitute credible evidence of erratic or unusual behavior for purposes of K.S.A. 2009 Supp. 44-501(d)(2)? The Board does not define these broad terms. Further, it is unclear what recognizable signs the Board would consider as credible evidence of erratic or unusual behavior, especially when this court considers the fact that Wiehe had worked on this particular project for Kissick for only a few days.

*Failure to Adequately Consider Evidence that Wiehe's Injuries were Contributed to by His Impairment*

Ultimately, in order to get to its decision that Kissick had failed to meet the impairment exception under K.S.A. 2009 Supp. 44-501(d)(2), the Board had to create the super high burden of proof on Kissick to present credible evidence of Wiehe's erratic or unusual behavior on the morning of the accident. By doing so, the Board was able to marginalize or trivialize the increasing evidence that Kissick had presented to meet the Board's demands.

Moreover, the Board had imposed so high of a standard that Kissick would seemingly never be able to meet it. For example, the Board stated that if Wiehe "was so impaired as Dr. Brown suggests, one would expect at least one of his coworkers to say or do something to prevent him from continuing on with his job on that day long before he tipped the equipment over and was injured." Thus, even if Wiehe's coworkers had seen some seemingly impaired behavior from Wiehe on the morning of the accident, such behavior would not have met the standard set by the Board unless Wiehe's coworkers prevented him from continuing on with his job before the accident occurred. Nevertheless, if Wiehe's coworkers had prevented him from operating the machine, the present workers compensation case would not have existed.

Instead of the vague erratic or unusual standard imposed by the Board, the question under K.S.A. 2009 Supp. 44-501(d)(2) is whether Kissick showed that Wiehe's injuries were contributed to by his drug use. The evidence presented to both the ALJ and the Board demonstrated that Wiehe's decision to back over the large mass of dirt was an impaired decision and should not have been made by an experienced operator such as Wiehe. Specifically, Matter, who was an experienced operating engineer and a union trainer, testified that Wiehe's actions of backing over the mass of dirt showed an extreme lack of judgment for an experienced operator. Even Wiehe admitted that the sheep's foot roller he was operating was not as powerful as others he had operated and that it had rubber wheels instead of the heavier steel wheels found on other sheep's foot rollers. Matter testified that there was nothing to account for the accident other than Wiehe's marijuana impairment.

Lawson, whom the ALJ determined to be in the best position to view Wiehe's actions, testified that he was "pretty much just freaked out" when Wiehe backed up to the mass of dirt and tried to convey to Wiehe to "just forget it, don't try to do it." Lawson testified that he thought the mass of dirt was too large for the machine and was concerned that the machine was going to flip over when Wiehe backed over the mass.

Brown then explained how marijuana would have affected Wiehe's decision-making ability in the events leading up to the accident. Brown further explained how Wiehe's decision to back over the pile and his failure to wear his seatbelt when attempting such a feat were attributable to Wiehe's marijuana impairment. Further, Foshee testified that Wiehe's decision to back over the pile, knowing that the sheep's foot roller was more tipsy than the others he had operated, was a decision impaired by Wiehe's marijuana use.

In short, with all of the evidence presented to the Board, Kissick met its burden of proof under K.S.A. 2009 Supp. 44-501(d)(2) to show that Wiehe's injuries were contributed to by his drug use. As the dissenting Board member so aptly stated:

"This Board Member finds Dr. Brown's testimony on the issue of claimant's impairment and its causal connection to his accident to be persuasive. Claimant admits that he smoked marijuana with the blood test showing that claimant had 62 ng/ml in his system. Pursuant to K.S.A. 44-501(d)(2) he was presumptively impaired at the time of his accident. His questionable actions and demonstrable lack of judgment in operating the machinery on the morning of his accident lead to the conclusion that his impairment caused or contributed to his accident. Thus, respondent is not responsible for claimant's injuries."

*Klaassen's Testimony Concerning Wiehe's Impairment*

Finally, it should be pointed out that although Wiehe points to Klaassen's testimony to support his argument that Kissick had failed to meet its burden of proof under K.S.A. 2009 Supp. 44-501(d)(2), Klaassen's testimony and statements in his written report really related to whether Wiehe was impaired when the accident occurred. The question of Wiehe's impairment, however, had already been conclusively established by K.S.A. 2009 Supp. 44-501(d)(2), and there was no issue as to whether Wiehe was impaired when the accident occurred. Moreover, Klaassen's testimony and written report would have very likely been held inadmissible in a court of law.

When the opinion of an expert witness is not within the witness's special knowledge, the testimony is speculative. See *In re Central Kansas Electric Coop, Inc.*, 224 Kan. 308, 312-13, 582 P.2d 228 (1978) (testimony regarding effect of electric fields upon pigs not within scope of special knowledge possessed by engineer); see also *Choo-E-Flakes, Inc. v. Good*, 224 Kan. 417, 419, 580 P.2d 888 (1978) (witness without experience as a grain mill operator or feed mixer not qualified as expert on grain milling and feed mixing).

When we consider Klaassen's special knowledge about how the human body handles marijuana, we note that he testified that he had not specifically studied or done research with marijuana:

"Specifically about marijuana, *I haven't done research specifically with marijuana*, but all of the principles in relationship to how the body handles foreign chemicals, et cetera, are of course similar for marijuana as for many other chemicals, although there are some specific differences." (Emphasis added.)

When a witness has special knowledge, the testimony must be within the scope of that special knowledge. See *In re Central*, 224 Kan. at 312-13.

*In re Central* involved testimony from a mechanical engineer that the electrical field beneath transmission lines might endanger the health of pigs. Our Supreme Court held that the opinion should have been stricken as speculative because the engineer had no experience concerning the effects of electrical fields on animals. The engineer's opinion was based on studies which were, at best, inconclusive on the question. 224 Kan. at 313. Similarly, Klaassen had no experience concerning the effects of marijuana on the human body. As a result, his opinion is speculative and would have been inadmissible under the above-cited authority.

Even if we were to consider Klaassen's objectionable testimony and written report, we note that he has elevated his testimony and written report above the plain text of K.S.A. 2009 Supp. 44-501(d)(2), which clearly sets out when an employee shall conclusively be presumed to be impaired due to alcohol or drugs. For example, Klaassen's testimony throughout his deposition focused on his opinion that Wiehe was no longer impaired by marijuana when the accident occurred. During his deposition, Klaassen explained that the effects of marijuana wear off after a few hours and would *definitely* not last for 15 hours:

"The impairments and effects that marijuana produce depends, first of all, on how much a person is exposed to, but, in general, we're talking about a few hours. And the typical smoking of marijuana, people have effects for, you know, a very few hours, you know, like one, two, three hours after one smokes a couple of joints. And, you know, it can be, you know, maybe four hours or so, *but it definitely is not in the ballpark of 15 hours.*"

Klaassen's opinion was that Wiehe, who had smoked marijuana the night before the accident, would not have been experiencing any of the impairing effects of marijuana when the accident occurred.

Throughout his testimony, Klaassen maintained that the conclusive presumptive level of marijuana impairment under K.S.A. 2009 Supp. 44-501(d)(2) was not an accurate measurement of impairment. In explaining that there was not a good correlation between marijuana concentrations in the blood and the impairment level, Klaassen testified as follows:

"[W]hat happens with marijuana is that its effects are—let's say come back to normal much, much sooner than does the blood levels. So there's, in essence, a

discrepancy—a normal discrepancy between blood levels and how impaired you are. So, for example, with ethanol, scientists know that there's a good correlation between blood levels and lack of ability to perform many functions, but with marijuana this does not occur."

Further explaining that the presumptive level of marijuana impairment under K.S.A. 2009 Supp. 44-501(d)(2) was an inaccurate measurement, Klaassen testified as follows:

"[G]oing back to ethanol, there is an excellent correlation between blood levels and effects on the body. With marijuana like this there is not. And our laws, unfortunately, the one on ethanol is based on science. The THC law that we have in Kansas is not on science. It's on—I can't think of a better word but 'politics.' It's not a scientifically-derived number."

Thus, according to Klaassen, the 62 ng/ml level in Wiehe's blood "does not tell us anything about whether a person has any effects whatsoever from the marijuana."

The argument that the marijuana metabolite levels set forth under K.S.A. 2009 Supp. 44-501(d)(2) do not correlate with an employee's marijuana impairment is one that should be taken up with the legislature. As a court, we do not change the wording of statutes to coincide with part of the testimony offered in a case. Instead, we follow the plain meaning rule. This rule states that when the language of a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily found in it. If the statutory language is clear, no need exists to resort to statutory construction. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009). There is no room for judicial construction. See *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003); *State v. Stevens*, 36 Kan. App. 2d 323, 330, 138 P.3d 1262 (2006), *aff'd* 285 Kan. 307, 321-22, 172 P.3d 570 (2007).

The plain and unambiguous language of K.S.A. 2009 Supp. 44-501(d)(2) creates a conclusive presumption of impairment if it is shown that at the time of the injury the employee had a GCMS confirmatory test by quantitative analysis showing a marijuana metabolite concentration of at or above 15 ng/ml. Because Wiehe had

a marijuana metabolite concentration in excess of 15 ng/ml, he was conclusively impaired under K.S.A. 2009 Supp. 44-501(d)(2) when the accident occurred, and Klaassen's testimony cannot be used to supersede the plain and unambiguous language of the statute. See *Stevens*, 285 Kan. at 322 (determining that argument that would defeat plain meaning of statute " 'really lies with the legislature.' ").

Moreover, although Klaassen testified that the effects of Wiehe's marijuana use would have worn off by the time of the accident, his testimony about the impairing effects of marijuana was consistent with Brown's explanation of how the accident in question had occurred. Specifically, according to Klaassen, the impairing effects of marijuana would "lengthen" a person's reaction time and could cause the person to make bad judgments. As discussed previously, during his deposition testimony, Brown explained how Wiehe's impairment, which resulted in poor judgment and impaired reaction time, contributed or caused the accident in question. With Brown's testimony about how Wiehe's impairment contributed to or caused the accident in question and Wiehe's own witness admitting that the impairing effects of marijuana were the same as those that Brown had attributed to causing the accident, there is not substantial evidence in the record to support the Board's decision that Kissick failed to meet the impairment exception under K.S.A. 2009 Supp. 44-501(d)(2).

In conclusion, a review of the Board's decision that Kissick had failed to meet the impairment exception under K.S.A. 2009 Supp. 44-501(d)(2) is not supported by evidence that is substantial when viewed in light of the record as a whole. The employer pointed to evidence that compels the conclusion that Wiehe's injuries were contributed to by his conclusively established marijuana impairment under K.S.A. 2009 Supp. 44-501(d)(2) and, therefore, Kissick is not liable for workers compensation benefits. Accordingly, we determine that Kissick met its burden to prove the impairment exception under K.S.A. 2009 Supp. 44-501(d)(2) and reverse the Board's decision.

Reversed.